Eddie GLENN, Plaintiff,

v.

Fred T. WILKINSON and Harold R.
Swenson, Defendants.

No. 1389.

United States District Court,
W. D. Missouri,
Central Division.

Feb. 26, 1970.

Joseph S. McDuffie, St. Louis, Mo., for plaintiff.

John C. Danforth, Atty. Gen., State of Missouri, Howard L. McFadden, Gen. Counsel, Dept. of Corrections, Jefferson City, Mo., for defendants.

## MEMORANDUM OPINION AND ORDER

JOHN W. OLIVER, District Judge.

### I.

This is a Section 1983, Title 42, United States Code, action brought by an inmate of the Missouri Penitentiary against the Director of the Missouri Department of Corrections and the Warden of that institution. Plaintiff was convicted of first degree murder in the Circuit Court of the City of St. Louis and was sentenced to death in that court on November 27, 1965. That conviction was affirmed on direct appeal by the Supreme Court of Missouri on May 13, 1968. See State v. Glenn (Sup.Ct. of Mo. en Banc, 1968) 429 S.W.2d 225.

When plaintiff filed this case, and at the time hearings in this case were held, he was confined in an eight by ten foot cell in the B-South unit, the punitive section of the Maximum Security Unit of the Missouri Penitentiary. Also housed in B-South were the most incorrigible of prisoners segregated from the general prison population and prisoners who had become insane. In short, B-South was the most restricted place in the entire penitentiary.

In various pleadings plaintiff alleged that the conditions of his confinement constituted cruel and unusual punishment and other violations of his federally protected constitutional rights. Most of plaintiff's specific complaints arose out of the fact that plaintiff was being kept in the punitive segregation area and therefore suffered all the disabilities of inmates in that unit.

Out of deference to the then pending postconviction proceeding in the State trial court,[1] we delayed the time within which the parties could file their respective suggested findings of fact and suggested conclusions of law. The last paragraph of our order fixing the time for the filing of the parties' suggestions provided that "if the defendants, in light of the testimony and evidence adduced at trial, have in fact or intend in the near future to make any changes in the conditions of plaintiff's confinement, defendants shall so state at the time defendants' suggested findings and conclusions are filed * * *."

On January 15, 1970 defendants filed a motion to dismiss for mootness. That motion set forth some of the circumstances which plaintiff claims violate his federally protected right not to be subjected to cruel and unusual punishment. Defendants' motion then alleged:

That all inmates of the Missouri State Penitentiary under the death sentence, including the petitioner, have been moved to new quarters in a separate facility with wholly different conditions from those described and complained of in the petition as more

---

1. The Circuit Court of the City of St. Louis has recently denied plaintiff's postconviction motion filed in that court.

Plaintiff's appeal from that denial is presently pending in the Supreme Court of Missouri.

particularly described in the attached affidavit and exhibit.

The affidavit attached in support of that motion, in the form of a verified interoffice communication from Warden H. R. Swenson to Mr. Howard L. McFadden, General Counsel for the Department of Corrections, dated January 12, 1970 stated:

Subject: PRISONERS UNDER DEATH PENALTY

On January 7, 1970, the inmates confined in the Receiving Cells at MSP were transferred to Moberly. We then proceeded to prepare this unit for the housing of inmates under death penalty. On Saturday morning, January 10, 1970, the following inmates under the penalty of death were transferred to these cells:

Cell 1—Eddie Steve Glenn

Cell #2—John Scott and William Coleman

Cell #3—Terry Cobb

Cell #4—Louis Scott

Cell #5—Charles Beal

Cell #6—Theodore Duisen

You already have the Transcript of Serial Record, showing the offense for which the inmate was convicted, the date he was received, etc.

The six Receiving Cells are equipped with two beds in each and have running water and toilets. Each cell is also equipped with a portable television set in good operating condition. We have initiated a daily program for these inmates and we have some equipment to bolster the program, including a new pool table, medicine ball, etc. Two inmates will be permitted outside of the cell block each morning and afternoon which means that every inmate will have a recreation period of two hours or more out of every day and a half. One inmate has been selected as cleaner, so he will be out most of the time.

We have issued good eating utensils and the zone lieutenant is transporting each meal from the main kitchen in thermos containers and the food is then served in cafeteria style. We will make changes from time to time in order to give these inmates as much variety as possible. We have established medical and security procedures (copy of security procedures attached).

A number of us have been down to the receiving section after the inmates were moved (Director, Warden, AWC, AWT, etc.) and we all found that these inmates were exceedingly pleased with the new program. They were especially grateful for the fact that the unit is quiet and that they can read, sleep or whatever without distraction.

I think I should add that we did a lot of work in the two days that this unit was empty—we installed new mattresses, pillows, sheets and blankets. We installed new furniture in each cell consisting of new metal locker, table and chair. A refrigerator has been provided to store a few essential items. A refrigerated water cooler is being installed today. Eating utensils consist of new plastic trays, bowls, cups, knives, forks and spoons. An exercise bicycle is being repaired and will be issued in a few days. A table and typewriter have been issued for inmates' use in preparing legal material.

The newly promulgated regulations applicable to the new unit, in addition to providing for appropriate security maintenance of the new unit, provided that:

5. The inmates housed in this unit will be fed from the main kitchen under the supervision of the Zone I Lieutenant. The Zone Lieutenant will personally transport the food to this unit.

6. The inmates will come to the serving window to get their trays, then return to their cells to eat.

7. The doctor will visit this unit weekly and provide call service from the hospital.

8. Incoming mail will be picked up by the evening watch officer. Outgoing mail will be handled by the Receiving Unit Sergeant.

9. One inmate from this group will be selected by the Zone Lieutenant and approved by the Associate Warden of Custody as unit cleaner. Individual cells will be cleaned by the occupants.

10. Bathing and shaving will be done during exercise periods. Haircuts on Saturdays only and will be supervised by the Zone Lieutenant.

11. The security cage doors and the cell doors will be locked at all times except for necessary movement. The cell doors may be left open during mealtime but locked immediately after.

12. Daily recreation periods outside the cage will be allowed. There will be no more than two inmates (plus the cleaner) at a time outside their cells. Recreation and television privileges will be forfeited for infraction of rules.

Counsel for plaintiff was requested to confer with plaintiff and to file an appropriate response to defendants' motion. Such response stated "that the facts stated in defendants' affidavit and exhibit are substantially true according to Eddie Glenn as related to this counsel on the 27th day of January, 1970," with certain variances which will be noted and discussed later.

■ It is obvious that changes voluntarily made by the defendants on January 10, 1970 have a profound effect upon a number of questions presented in the pending litigation. But not all the questions presented and litigated were mooted by the changes made in accordance with the Warden's memorandum. It is therefore necessary that we deny defendants' motion to dismiss.

## II.

The defendants' voluntary and highly commendable action of moving all death sentence prisoners, including plaintiff, to a facility entirely separate from incorrigible prisoners leaves for determination the question of whether any of plaintiff's federally protected rights are violated under the new situation.

It is not necessary to make any findings or to state any conclusions concerning plaintiff's allegations concerning the conditions of plaintiff's former confinement in the punitive portion of the maximum security unit because plaintiff's removal therefrom and the changes reflected in the Warden's memorandum of January 12, 1970 have in fact mooted many of the questions presented. Plaintiff's response to defendants' pending motion concedes that "the facts stated in defendants' affidavit and exhibit are substantially true." [2] All of the questions presented by plaintiff's complaint and others which were litigated under Rule 15(b) of the Rules of Civil Procedure, however, were not mooted by the recent establishment of new quarters for death sentence inmates. It is therefore necessary that such questions be decided.

## III.

■ The record requires a finding that the only major difference in the present treatment of death sentence inmates in comparison to that given other prisoners is that the death sentence inmate cannot commingle with the general prison population. We expressly find that under the new situation all rights and privileges accorded inmates in the

2. Plaintiff's response shows on its face that it was prepared after plaintiff's counsel conferred with plaintiff on January 27, 1970. In a letter addressed to the Court dated February 7, 1970, plaintiff stated in part that it was true that

"we have been move [sic] to a new quarters in a separate facility with whally [sic] different conditions then [sic] was described in my complained [sic]."

general prison population are now being accorded death sentence inmates except the right to be commingled with the general prison population. We conclude that plaintiff's confinement as a death sentence prisoner in an entirely separate facility within the penitentiary under the circumstances stated in the Warden's memorandum of January 12, 1970 separate both from a maximum security unit within which incorrigible and insane inmates are housed, and also separate from the general prison population, does not, under applicable principles of law, violate any of plaintiff's federally protected rights.

It became apparent in the earliest stages of this litigation that accurate information concerning the manner in which death sentence prisoners were confined in other institutions pending appeals and postconviction proceedings had never been systematically reported. Because the cruel and unusual punishment questions present questions of fact, see Courtney v. Bishop, (8th Cir.1969) 409 F.2d 1185 at 1187, it was necessary to collect information from jurisdictions in the United States which still retain the death sentence.

Defendants called three highly qualified expert witnesses, Maurice Sigler, present Director of the Nebraska Division of Corrections; J. C. Taylor, Commissioner of Corrections for the State of Kentucky; and Charles D. McAtee, who recently retired as State Director of Correctional Institutions in Kansas. All the expert witnesses expressly testified that they were in agreement with each other. Warden Swenson testified that he was in general agreement with all the experts who testified for the defendants (Tr. 247, 248, 338). The expert testimo-

ny was in accord with other information collected during the trial.

Director Wilkinson collected valuable data in response to a letter he addressed to the heads of all correctional institutions in jurisdictions which still retain the death sentence. See Defendants Exh. 1. At the request of counsel, the Court forwarded a detailed questionnaire in a form agreeable to counsel for both sides to the same institutions. (Tr. 4).[3] See Court Exh. 1 for questionnaire and answers.

The answers to Mr. Wilkinson's letter indicate that in eighteen of the States death sentence inmates are housed in entirely separate quarters removed both from incorrigible maximum security units and from the general prison population.[4] Letters to Mr. Wilkinson from eight other States show that in several of the institutions in those states death sentence prisoners are generally treated as any other member of the general prison population or that such a change is presently under consideration. The conclusion which must be drawn from the expert testimony, from the letters to Mr. Wilkinson, and from the answers to the questionnaire (Appendix A) is that separation of death sentence inmates from the general prison population is an accepted and acceptable correctional practice. We conclude that such a practice, standing alone, does not violate "man's basic dignity," "civilized precepts," and current "standards of decency" (see Jackson v. Bishop, (8th Cir. 1968) 404 F.2d 571, 578). The apparent fact that several institutions throughout the nation have changed or are thinking about changing their policy so that death sentence inmates would be integrated into the general prison popula-

3. We repeat the expression of gratitude made at trial for the cooperation extended by the heads of correctional departments and wardens who took the time and trouble to respond to Mr. Wilkinson's letter and to the questionnaire (Tr. 5). Because of the requests of many of those persons for the results of the questionnaire we have prepared and attach as

an Appendix a summary of the questionnaire answers received.

4. Arizona, California, Connecticut, Florida, Georgia, Illinois, Kentucky (substantial changes were made subsequent to letter), Louisiana, Maryland, New Hampshire, New Jersey, Ohio, Oklahoma, South Carolina, Tennessee, Virginia and Washington.

tion does not require a different conclusion.

## IV.

 Five of seven alleged "variances" contained in plaintiff's response to defendants' motion between Warden Swenson's affidavit and what plaintiff contends is the situation in the new facility are not substantial. Plaintiff contends that "no doctor has been seen by this petitioner since being moved to new quarters." While the new procedures contemplate that a "doctor will visit this unit weekly and provide call service from the hospital," it is obvious that plaintiff does not allege that he has needed or that he was, in fact, denied medical care. In a similar manner, plaintiff's allegation that he "has not been permitted to use the typewriter" because the "guard states that he has not been so instructed;" his complaint that the food "is brought in plastic ice cream containers" rather than in "thermos containers" (as stated in the affidavit); his complaint "there is no evening mail pickup by the evening watch officer as alleged in the document called 'Receiving Cell Procedures, Revised January 1970;'" and his complaint that there is "tension in this area is building up again because of the threats of Zone Lt. Jack Stewart to get sticks and beat the inmates," are generally expressions of alleged failures literally to comply with the new plan and program. Plaintiff's expression of fear that a particular officer may, at some time in the future, violate the letter and spirit of the explicit policy declarations of his superiors, does not present a justiciable question. We do not believe that any of the claims just stated, under the particular facts and circumstances can be said to present substantial federal questions.[5] We so find and conclude.

## V.

 In regard to plaintiff's complaint *concerning his lack of knowledge* of the rules and regulations, Mr. McFadden's letter of February 10, 1970 states:

f. The Inmate Pamphlet is given to every inmate of the Missouri Penitentiary on admission including those under the death sentence. The Penitentiary rules and regulations apply to all inmates including those under the death sentence. In addition a copy of the rules and regulations provided in my motion to dismiss has been posted on the bulletin board in the area where the men under the death sentence play pool and otherwise exercise so that they can see and read them.

Defendants are to be commended for their action in posting the rules applicable to the death sentence facility in a place where they may be read by plaintiff and others similarly situated; there is no necessity for any order. See Burns v. Swenson, (W.D.Mo.1968) 288 F.Supp. 4, at 10.

## VI.

One remaining question of substance is, however, presented by plaintiff's response to defendants' motion to dismiss and an appropriate order is necessary in regard to a second issue previously presented. The first issue is in regard to plaintiff's complaint that " 'Special purpose mail' is still sent back to petitioner." The other question concerns plaintiff's freedom of religion, as guaranteed under the First Amendment.

In his letter to Mr. McDuffie dated February 10, 1970, Mr. McFadden did not specifically admit or deny that plaintiff was being prevented from mailing special purpose letters. The evidence in this case with respect to special purpose

---

5. Plaintiff's letter to the Court dated February 7, 1970 was typed. Mr. McFadden's letter to Mr. McDuffie of February 10, 1970, pointed out that Mr. Glenn now has a typewriter of his own which is removed from his cell only at night, as a security measure. That letter also noted that there was an error · in regard to the delivery and pickup of mail regulation which has since been corrected.

mail makes it abundantly clear that difficulties have consistently been experienced in regard to special purpose mail.[6]

The apparently continuing difficulties plaintiff has consistently encountered in regard to special purpose mail suggest that future difficulties and litigation will be avoided if we enter an order consistent with principles articulated by Chief Judge Becker in Peek v. Ciccone, (W.D.Mo.1968) 288 F.Supp. 329. Such order will be designed to effect changes that are calculated to insure proper administrative handling of special purpose mail and to keep such questions out of court litigation. See also and compare Jackson v. Godwin, (5th Cir. 1968) 400 F.2d 529.

### VII.

The final question presented relates to plaintiff's First Amendment claim. Judge Blackmun in Sharp v. Sigler, (8th Cir. 1969) 408 F.2d 966, 972, a First Amendment case, stated that the maximum security petitioners involved in that case (one of whom was under death sentence) "will be entitled to enjoy what they earn [when, and if, they] demonstrate by their continuing conduct that they are entitled to what they respectively seek." Neither the Warden's memorandum nor the new regulations applicable to the new unit make any mention of plaintiff's right to participate in the religious services of his faith; neither insure that plaintiff, by abiding with all applicable rules, may earn the right to worship as others of his faith.

The facts and circumstances developed at trial require that an appropriate order be made to avoid future difficulties concerning this important matter.

Plaintiff is a Catholic. He testified that he had not been permitted to go to Mass or Communion as any other Catholic prisoner since he had been in confinement (Tr. 26). Warden Swenson testified that religious services, as such, were not made available to condemned prisoners (Tr. 171). Father Cronin, the Catholic chaplain, stated that plaintiff was one of his parishioners, that he usually visited the maximum security unit "once every ten days" (Court Exh. 2, part II). He further testified that he conducts regular services at the main institution both on Sunday and on Wednesday afternoon (Tr. 271–273). The record shows that once a month Father Cronin gave plaintiff Communion in the shower room in the punitive section of maximum security (Tr. 26).

On May 22, 1969 Father Cronin requested "that the inmates of the maximum security unit who wished to receive the sacraments, since they would average only about four a month, that they would be brought to the chapel by a guard and during the mid-week, weekday, I would administer the sacraments in the chapel" (Tr. 273). That request was denied.

Defendant adduced no evidence that security or any other consideration required the continuation of the current practice or why Father Cronin's suggestion should not be adopted. We recognize the possible applicability of Judge Blackmun's reference to Matthew 6:5–7 in Sharp v. Sigler, *supra*, at 971.

We conclude, however, that the shower room in which Father Cronin was

---

6. The undisputed evidence in this case shows, for example, that during the pendency of this case plaintiff attempted to write "Mr. Chief Justice Warren," "Mr. Justice Clark," "Mr. Justice Fortas," and "Mr. Justice Marshall." The mail room censor refused to mail those letters and returned them to plaintiff with a note which stated: "You may write to a federal judge in a sealed letter if you identify him as such & not as 'Mr.'" (Pl. Exh. 1, page 9).

In a not dissimilar manner letters addressed to the American Civil Liberties Union in St. Louis and to Dr. Kemper of the University of Missouri School of Medicine which plaintiff wrote immediately after one of the hearings in this case in which he sought legal assistance and an expert witness were stopped by the mail room censor.

forced, without any appropriate reason, to administer to his parishioner is not a proper closet within the meaning of the First Amendment. A provision for worship will therefore be included in our order.

Joseph S. McDuffie, Esquire, a member of the St. Louis Bar, has represented plaintiff *pro bono publico* throughout this litigation. The Court is grateful for the effective legal assistance given to his client and commends him for the services rendered in the highest tradition of the Bar.

## VIII.

For the reasons stated, it is

Ordered that defendants' motion to dismiss should be and is hereby denied. It is further

Ordered that defendants be restrained from interfering with plaintiff's special purpose mail. Specifically, defendants shall modify their procedures in regard to plaintiff's special purpose mail in a manner which shall provide adequate and appropriate provisions of administrative review by the Warden of any lower echelon administrative determination that a particular piece of plaintiff's special purpose mail shall not be mailed. The Warden may, of course, delegate review of plaintiff's special purpose mail to the General Counsel for the Department of Corrections. It is further

Ordered that defendants shall grant Father Cronin's request for the establishment of mid-week religious services for Catholic death sentence prisoners and that plaintiff be permitted to attend those services. Plaintiff's right to attend, of course, is conditioned upon his compliance with all applicable rules and regulations. It should be understood that defendants may permit plaintiff to attend regular Catholic Sunday services under appropriate supervision. Should they do so, such action will be considered full compliance with the provisions of this order directing that Father Cronin's request for mid-week services be granted.

## APPENDIX A

Questionnaires were mailed to 46 jurisdictions requesting information about the place and conditions of confinement of death sentence inmates in penal institutions in the respective jurisdictions. Nine jurisdictions in which there is no capital punishment (Alaska, Hawaii, Iowa, Maine, Michigan, Minnesota, Oregon, West Virginia and Wisconsin) were not sent questionnaires. Seven jurisdictions did not reply. Two, Missouri and Virginia, did not answer the questions because of pending litigation. New York City stated that it did not hold death sentence inmates. Of the 36 replies, two, Montana and North Dakota, explained that their replies would be of little value because there had been no death sentence inmate in the institutions for a long period of time. The data reported is therefore from 34 completed questionnaires.

1. *Segregation from general population:*

Only one State, Arkansas, indicated that it permits commingling with the general population during daytime activities, but not with respect to housing.[7] New Hampshire, which failed to reply to the questionnaire, apparently permits commingling. See reply to Director Wilkinson's letter, Def. Exh. 1. Twelve State statutes require segregation of condemned men. In 14 states segregation is solely by custom and in 9 by administrative regulation. (In Illinois one institution stated segregation is by custom, another stated it is by regulation; both are reflected in the statistics above).

2. *Experiments with integration:*

All but six jurisdictions indicated that their institutions never followed any dif-

---

7. It is doubtful whether the example of Arkansas is particularly valid. See the recent opinion of Chief Judge Henley in

Holt v. Sarver, (E.D.Ark., 1970) 309 F. Supp. 362.

ferent practice or tried any experiment with respect to integration of death sentence inmates into the general population. Arkansas permitted its inmates to work in the general population beginning in 1967 and the practice continues to date. Kentucky began to experiment with increased activity for the death sentence inmates in 1969. Four States stated that they hoped to be able to make changes in their current policy. The Maryland statute was amended in 1966 to permit integration.

### 3. *Reasons for segregation:*

Almost all institutions gave similar reasons for not integrating death sentenced inmates into the general population. Prominent are the following: (1) danger of escape; (2) danger of suicide; (3) danger of violence to others, especially since presumably a condemned man has nothing to lose; (4) need for protection and closer supervision; (5) different needs from the general population; (6) not ordinary inmates, merely confined for safekeeping; (7) depressing influence on the general population; (8) required by statute. Four states stated that a rethinking of the problem was in order.

### 4. *Length of time of confinement on "death row":* ·

Almost all of the institutions stated that the average length of time for death sentence inmates to be confined before execution has been dramatically increasing. Several institutions replied that the length of time varies depending upon the speed of the inmate's litigation. The average length of time has been increasing since there have been few executions during the 1960's. Fifteen replies indicate that death sentence inmates have been held on death row for a period of at least eight years.

### 5. *Contact with other death sentence inmates:*
Permit contact with other death sentence inmates: 29 Yes 
 3 No

### 6. *Contact with general population:*
Permit contact with general population: 4 Yes 
28 No

### 7. *Contact with visitors:*
Permit contact with visitors: 31 Yes 
 0 No

### 8. *Contact with counsel:*
Permit contact with counsel: 32 Yes 
 0 No

### 9. *Exercise:*
A. Death sentence inmates have less exercise than general population: 20 Yes 
 0 No 
 5 Same

B. Outdoor exercise only 5 
Indoor exercise only 7 
Indoor and outdoor 10 ·

C. Amount of exercise: 
Less than 1 hour per day 7 
At least 1 hour per day 20

### 10. *Food:*

Almost all institutions feed death sentence inmates in their cells through the use of hot carts or equivalent equipment. Six institutions permit death sentence inmates to eat in the main dining hall although they are kept separate from the general population.

### 11. *Medical care:*

All institutions provided medical care as found necessary. In many cases, doctors or nurses made daily rounds.

### 12. *Religious privileges:*

Twenty-four institutions permit visits by the chaplain to the condemned. Ten have weekly or bi-weekly services which can be attended.

### 13. *Privileges and diversions:*

Privileges granted death sentence inmates include hobbies, library, visits, mail, radio, and in 13 institutions T.V. Five institutions permit art work or correspondence courses.

### 14. *Mail:*

Twenty institutions have the same rules for death sentence inmates' mail as the rest of the population. Six institutions permit more letters to be mailed or are otherwise more liberal although they sometimes impose stricter security measures. Five institutions report more restrictions which in the case of three institutions are stricter security measures.

### 15. *Clothing:*

The clothing worn by those sentenced to death is the same as that worn by the general population in all but five states, which require the same attire as that worn by maximum security inmates.

One institution requires the removal of belts or other possible hazards from the clothing.

### 16. *Commissary:*

Twelve institutions limit commissary privileges. Of the institutions which restrict commissary privileges, the restrictions primarily are with respect to items which may be dangerous, e.g., glass containers. Three institutions provide more liberal privileges for death sentence inmates, namely, free canteen for the indigent and unlimited use. All others permit the same commissary privileges with the exception of choosing from a list of items rather than going to the commissary.

### 17. *Reasons for restricting privileges:*

Privileges denied the condemned men are primarily as a result of the regulations concerning separation from the general population, namely, restrictions on movement, movies, athletic events, school and jobs. The reasons given for the denial of privileges are similar to the reasons given for segregation in the first place—security and danger of escape and violence.

### 18. *Housing near incorrigibles and the insane:*

Twenty-two institutions do not house death sentence inmates near incorrigibles or the insane. Eight do house condemned men near incorrigibles, i.e., in the same general section of the institution in which maximum security prisoners are held. None stated they housed condemned men with or near insane inmates.