Larry C. CLONCE, Petitioner,

v.

Elliot L. RICHARDSON, Respondent.

Forrest GUSTAVE and Isaac Taylor, Petitioners,

v.

Richard KLEINDIENST, Respondent.

Gerald McDONNELL, Petitioner,

v.

Richard KLEINDIENST, Respondent.

William Leon RUIZ, Petitioner,

v.

Dr. P. J. CICCONE, Respondent.

Edward M. SANCHEZ, Petitioner,

v.

Dr. P. J. CICCONE, Respondent.

Gerard WILSON, Petitioner,

v.

Dr. P. J. CICCONE, Respondent.

Nos. 73 CV 373-S, 73 CV 164-S, 20224-1, 20182-4, 3061-4 and 73 CV 7-S-2.

United States District Court, W. D. Missouri, S. D.

July 31, 1974.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

I.

The above cases are those remaining from a larger number of cases filed to challenge each prisoner's transfer and retention in the S.T.A.R.T. program at the Medical Center for Federal Prisoners at Springfield, Missouri. Habeas corpus, federal question, and declaratory judgment jurisdiction are invoked in various of the cases which, by agreement of the parties, were processed on a consolidated basis. Although some of the cases were originally commenced *pro se,* all of the prisoners were eventually represented by either the Federal Public Defender for this district or by attorneys for The National Prison Project of the American Civil Liberties Union.

This Court has received throughout this litigation exemplary cooperation from all counsel representing the prisoners and from the Bureau of Prisons and counsel representing the Bureau. We therefore express our appreciation to all concerned and commend them for their cooperation with each other and with this Court for their assistance in devising procedures under which these cases were determined.

Pursuant to those procedures, the parties entered into a stipulation of numerous facts and agreed upon particular legal questions which would be presented by motions for partial summary judgment to be filed pursuant to Rule 56 of the Rules of Civil Procedure. It was contemplated that the Court would be able to consider the stipulated factual data, including the voluminous documentary evidence and the expert opinions of court appointed experts, rule all questions of law which did not involve any disputed question of fact, and then enter an order pursuant to Rule 56(d) which would identify what material facts were actually and in good faith controverted so that further proceedings could be directed under which the factual disputes and remaining legal questions could be expeditiously resolved.

Arpiar G. Saunders, Jr., Barbara M. Milstein, The National Prison Project of the American Civil Liberties Union Foundation, Washington, D. C., J. Jane Fox, Chief Counsel, Hawkeye Legal Aid Society, National Prison Center, Iowa City, Iowa, Ronald Roseman, Legal Aid and Defender Society of Greater Kansas City, Kansas City, Mo., R. Steven Brown, Asst. Federal Public Defender, Springfield, Mo., for petitioners.

Eugene N. Barkin, Legal Counsel, Bureau of Prisons, Dept. of Justice, Washington, D. C., Charles Faulkner, Sp. Atty., Medical Center for Federal Prisoners, Springfield, Mo., Frederick O. Griffin, Don Cooley, Asst. U. S. Attys., Springfield, Mo., for respondents.

As a part of the agreed pretrial procedures, counsel agreed to confer and jointly to recommend to the Court for appointment as expert witnesses the most knowledgeable and qualified persons available to examine the S.T.A.R.T. program, interview Medical Center staff and prisoners, and make appropriate reports of their expert opinions to counsel and to the Court. The experts recommended and appointed were Harold L. Cohen, Institute of Behavior Research, Silver Spring, Maryland; Dr. William DeRisi, Camarillo-Neuropsychiatric Institute Research Program, Camarillo, California; and Dr. Nathan Azrin, Anna State Hospital, Anna, Illinois. We are grateful for the services rendered by these experts which we now outline.

The parties agreed on the descriptive materials and data concerning the program and the prisoners involved to be furnished the experts in preparation of their later physical examination of the S.T.A.R.T. facilities and their interviews with Medical Center Staff and prisoners. On November 14, 1973, a further pretrial conference was held in Springfield, Missouri, with counsel and the three court appointed experts in attendance. The experts were explained their duties, furnished an agreed list of questions in writing, and immediately left for the Medical Center to begin their examination of the S.T.A.R.T. facilities and interviews of Staff and prisoners.

The experts' written reports were filed in the form of answers to the questions which had been submitted to the experts by the parties. In light of developments to be presently stated, it is unnecessary to summarize the reports of the three experts other than to say that one report was generally favorable to the techniques and results of the S.T.A.R.T. program; one was generally unfavorable; and one was generally favorable to the design of behavior modification programs similar to that of S.T.A.R.T. but expressed the firm opinion that all such programs should be voluntary rather than involuntary.

Pursuant to the pretrial procedures outlined, the parties were thus able to have before the Court a great deal of factual data, including the opinions of the three experts whom both sides agreed were competent, qualified, and impartial. Cross motions for summary judgment were filed in accordance with the agreed procedures and briefs were being submitted on an agreed schedule when, on February 11, 1974, the Court was formally advised by Norman A. Carlson, Director of the Bureau of Prisons, that S.T.A.R.T. was to be terminated by March 1, 1974. In that letter, Mr. Carlson stated in part:

As you know, the START program was an attempt to provide a more effective approach for dealing with a small, but highly destructive, group of inmates that are found in any correctional system . . . federal, state or local. For a number of years, we have been aware that the usual approaches in handling such individuals have been totally unsuccessful. In most instances, this group of offenders are housed in long term segregated status, isolated from the remainder of the institution and with no opportunity to participate in the various academic, vocational and recreational programs available.

\* \* \* \* \* \*

The primary objective of START was an attempt to work with these offenders to control their behavior so that they could participate in regular institution programs designed to help them make a successful community adjustment when they are eventually released from custody.

\* \* \* \* \* \*

At the time the program was initiated, it was anticipated that the population would build up to 30–35 individuals and be maintained at that level. We over estimated the number of individuals meeting the strict criteria of START. When the number of referrals declined to 3 in a 6 month period, it became necessary to reconsider the need for START. This review indi-

cated that there was a disproportionately large investment of manpower and facilities in the program by the Springfield staff.

As we have mentioned, START was a demonstration project during which we were able to try new techniques in working with an extremely difficult group of aggressive offenders. We undoubtedly made mistakes in the program but we also profited from the experience. Taking what we have learned, we are confident that we will be able to improve programs in existing facilities, thereby eliminating the need for the continuation of the unit at Springfield. Based on the insufficient number of inmates now assigned to the START unit and the costs involved, the program will be terminated on or before March 1, 1974.

We promptly called upon counsel for suggestions as to what procedural steps should be taken in light of the Bureau's announcement that S.T.A.R.T. would be terminated and also asked the Bureau to advise the Court as to what it intended to do with the S.T.A.R.T. participants upon the termination of the program. The problem of what should be done with the S.T.A.R.T. participants was solved by the parties' further agreement that each would be transferred back to his original institution "without prejudice to any suggestion that either side may have in regard to the ultimate disposition of the litigation." Such action was promptly taken.

The parties were and are in disagreement in regard to what further proceedings should be had in the pending cases. Petitioners contend generally that all questions presented are justiciable and that, in effect, all the procedures originally contemplated should go forward, including, but not limited to, the eventual examination and cross-examination of the expert witnesses in regard to their respective views of behavior modification programs in general and in regard to S.T.A.R.T. in particular. Respondents, on the other hand, contend that the Bureau's voluntary termination of S.T.A.R.T., under the circumstances above outlined, effectively mooted all questions of law presented by the pending motions for summary judgment and that the case should simply be dismissed.

We do not agree with the position of either side. We believe that while some of the questions presented were mooted by the Bureau's termination of S.T.A.R.T., all important questions were not mooted and that those questions should and must be decided.

## II.

Experience in other prison litigation establishes that it is not unusual for cases involving prisons and jails to take the turn this case has taken. The basic factual circumstances concerning prison conditions and prison procedures are rarely in substantial controversy and if, but only if, the prisoners and the institution are both represented by competent and informed counsel, the problem of establishing the undisputed factual circumstances is no more complicated than that presented in ordinary litigation. Once the factual circumstances are established, experience establishes that it is not infrequent that institutional changes are voluntarily made by the institutional administrators which have the practical effect of mooting many, but not all, of the legal questions presented by the old conditions and procedures.

Glenn v. Wilkinson (W.D.Mo.1970) 309 F.Supp. 411, involving the conditions of confinement of prisoners held under death sentence, is a good example of how changes voluntarily made during the course of litigation mooted many of the questions presented in that litigation. But that case illustrates that changes do not always moot all of the questions involved in a particular case. See also and compare Goldsby v. Carnes (W.D.Mo.1973) 365 F.Supp. 395, in which all parties agreed to a consent decree providing for administrative guidelines and for state court judicial review of administrative decisions for the Jackson County jail at Kansas City.

When we learned that certiorari had been granted in regard to McDonnell v. Wolff (8th Cir. 1973) 483 F.2d 1059, we concluded, in light of the fact all S.T.A.R.T. participants had been returned to their original institutions, to defer final determination of the justiciable questions presented by the pending motions until such questions could be decided in light of the Supreme Court's opinion in *Wolff*. The Supreme Court decided that case on June 26, 1974, see Wolff v. McDonnell, —— U.S. ——, 94 S. Ct. 2963, 41 L.Ed.2d 935 (1974).

Wolff v. McDonnell is peripherally helpful in regard to the mootness question. That case recognized that "the demarcation line between civil rights actions and habeas petitions is not always clear," directing comparison to the recent cases of Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); and Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971), and concluded that "both actions serve to protect basic constitutional rights."

While there are quite fundamental differences between civil rights actions and habeas actions by state prisoners, and actions for declaratory judgment and injunction and habeas actions by federal prisoners, we believe that any demarcation line between the two types of cases in regard to the applicability of constitutional standards to particular circumstances is equally dim. Again, the actions maintained by either a state prisoner or a federal prisoner against administrators of a correctional institution both serve to protect basic constitutional rights and principles applicable to any other form of action which raises similar questions of law should be equally applicable to both state and federal prisoner cases.

■ Questions of mootness raised by the Bureau of Prisons should therefore be determined by the familiar general standard of whether the problem is "capable of repetition, yet evading review," Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), most recently quoted and applied in Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). The gloss of Carafas v. La-Vallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), and Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L. Ed.2d 917 (1968), which re-examined and redefined standards of mootness in regard to habeas corpus, teaches that the principles applicable to ordinary civil litigation are particularly applicable in habeas cases, independent of declaratory judgment or injunction jurisdiction. *Sibron*, for example, concluded that "we do not believe that the Constitution contemplates that people deprived of constitutional rights at this level should be left utterly remediless and defenseless against repetitions of unconstitutional conduct." We are convinced that the mootness standard articulated in a state prisoner habeas case is also applicable to the pending federal prisoner cases.

■ Application of mootness standards requires consideration of the factual circumstances on a case by case basis. The Director of the Bureau of Prisons stated in his letter of February 11, 1974, that the Bureau intended to profit from the mistakes made in the S. T.A.R.T. program and that the Bureau was "confident that we will be able to improve programs in existing facilities." Any doubt about the Bureau's intention to continue various forms of behavior modification programs was eliminated by Mr. Carlson's statement of February 27, 1974 before the House Committee on the Judiciary, Subcommittee on Courts, Civil Liberties and the Administration of Justice.

Mr. Carlson's February 27, 1974 statement shows that the Subcommittee had specifically asked him "to comment on the use of 'behavior modification' techniques such as the START program at the Medical Center for Federal Prison-

ers, Springfield, Missouri." In responding to that request, Mr. Carlson felt that it was necessary to state emphatically and unequivocally that "the Federal Bureau of Prisons never uses and does not countenance the use of psychosurgery, electro-shock, massive use of tranquilizing drugs or any other form of aversive treatment to change behavior, no matter how aggressive or resistive an offender may be."

Mr. Carlson appropriately pointed out that "the problem in discussing 'behavior modification' is that the term is defined in a number of different ways." He explained that "In its broadest sense, virtually every program in the Bureau of Prisons is designed to change or modify behavior." With respect to the S.T. A.R.T. program, Mr. Carlson advised the Committee that "The most recent attempt to use 'behavior modification' techniques was the START program developed at the Medical Center for Federal Prisoners, Springfield, Missouri, during October, 1972, as a demonstration project." He explained that "Simply stated, START (Special Treatment and Rehabilitative Training) was an attempt to provide a more effective approach for dealing with those few, but highly aggressive and assaultive, inmates who are found in any correctional institution—federal, state, or local." Consistent with the advice given this Court, Mr. Carlson stated to the Committee that "While mistakes were undoubtedly made in developing the START program, we believe that the Bureau of Prisons profited from the experience."

With particular regard to the Bureau of Prisons' intention to use behavior modification programs similar to S.T.A. R.T., Mr. Carlson advised the Committee that:

> We recognize that 'behavior modification' does not represent a panacea or cure all for the deficiencies in correctional programming. It is, however, a valuable treatment technique which can be effectively used to motivate some groups of offenders. For

this reason, 'behavior modification' using positive rewards is an integral part of many of our correctional programs *and the Bureau of Prisons will continue to use this technique whenever appropriate.* [Emphasis ours.]

Under the circumstances of this particular case, we therefore find and conclude that there is a substantial likelihood that some of the questions presented will recur and that a justiciable issue capable of repetition, yet evading review, does exist which requires a definitive declaratory judgment of this Court under the circumstances. As we will indicate later, we do not believe that all of the questions initially presented need be decided because such questions have been rendered moot by the Bureau's termination of the S.T.A.R.T. program.

### III.

This part of this opinion will state the factual circumstances which exist without substantial controversy within the meaning of Rule 56(d) of the Rules of Civil Procedure and set forth particular material facts stipulated to by the parties.

The S.T.A.R.T. program was developed by the United States Bureau of Prisons to deal with offenders who have not, in the Bureau's view, adjusted satisfactorily to life in correctional institutions. It was designed by the Bureau after a study of programs at the State Reformatory for Boys, Yardville, New Jersey, and the Kennedy Youth Center, Morgantown, West Virginia. The Bureau adopted what it considered to be the more successful aspects of those programs in formulating S.T.A.R.T. which was specifically designed for adult offenders who had demonstrated an inability to conform to institutional standards.

Dr. Albert F. Scheckenback, S.T.A.R. T. program Professional Consultant, described the program as follows in his report of August 17, 1973 [Exhibit #6]:

> Project START has been developed for prisoners who have failed to adjust in normal institutional environ-

ments. While in this program, they will be confined to an isolated area until they have demonstrated consistently a potential to respond appropriately in a regular institution. Some inmates may never leave the program. Hence, a unit has been developed that will provide for their needs on the unit with movement to other areas of the institution prohibited except in dire emergencies.

A status system is assigned as the initial treatment program for START. The status system involves a number of levels which differ as to their responsibilities and privileges and allow an inmate to work his way through the different levels dependent on the appropriateness of his behavior. As an inmate consistently demonstrates his ability to get along at the current level to which he is assigned, he is rewarded by promotion to a more privileged level. The progressive levels not only reward appropriate behavior but are also an incentive for the inmate to do better. The privileges have been reduced so that a high level of privileges can be attained only if the inmate is returned to population of a regular institution. The START program is based on the theory that appropriate behavior can be strengthened by reward and inappropriate behavior extinguished. Moreover, the use of the team approach in setting goals for each inmate allows for individual programming and increased flexibility of treatment within the rigid status system.

Generally speaking, persons transferred to S.T.A.R.T. were individuals whose repeated aggressive acts within prison had resulted in their continual placement in segregation status. Often the aggressive and destructive behavior of the selected individuals had continued in segregation. In some cases, their behavior resulted in referral to the psychiatric unit at the Medical Center where investigation revealed that the individual was not psychotic. The goal of S.T.A.R.T. was not to develop behavior of an individual so that he would be able to conform his behavior to standards of society at large, but to develop behavior appropriate to confinement in open population of regular penal institutions.

The S.T.A.R.T. program was initiated on September 11, 1972 and continued until its termination by the Bureau of Prisons on March 1, 1974, under the circumstances above stated. During that period 99 individuals were considered for possible placement in the program. Of that number, 26 were determined to be appropriate referrals. Of that number, 19 individuals actually participated in the S.T.A.R.T. program. Seven of the participants had successfully completed the program and had been sent back to the regular institution population. Of the remaining group three were reported to be progressing well, four were resisting the program, three were showing little progress, and one was awaiting trial on charges of taking a correctional officer as hostage.

The functioning of the S.T.A.R.T. program is adequately described in the facts which were stipulated by the parties:

1. S.T.A.R.T. is an involuntary program. Prisoners who are selected for placement in the S.T.A.R.T. program are not notified that they are being considered for placement, not granted an opportunity for a hearing at the time of their selection for such placement, and not provided a forum or procedure to object or express an opposing view to their selection and placement.

2. A prisoner is selected for placement in the S.T.A.R.T. program after a referral by the warden of a federal institution wherein the prisoner is confined in segregation status, to the Office of the Coordinator of Mental Health Services of the Bureau of Prisons. The Coordinator of Mental Health reviews the prisoner's past history along with other factors as provided under the Policy of Bureau of Prisons, Operations Memo #7300.128. Since May 14, 1973, the Coordinator of Mental Health sub-

mits the inmate's name and history to the professional consultant and manager of the S.T.A.R.T. program for their comments or recommendations, and he then either rejects or accepts the inmate as a S.T.A.R.T. candidate in accordance with the criteria and facts relevant to said inmate. On his acceptance the inmate is informed and transferred to the S.T.A.R.T. program.

3. The S.T.A.R.T. program's purpose is to provide a coherent plan to assist an inmate to acquire and maintain responsible and productive behavior in caring for himself and his personal needs, and in association with others in order to adjust to the requirements demanded in an environment of a prison.

4. S.T.A.R.T. inmates are placed in a ward separated from the regular and segregated prison population. "Movement to other areas of the institution [is] prohibited except in emergencies."

5. Immediately prior to their transfer to S.T.A.R.T. each of the petitioners as well as all other S.T.A.R.T. subjects had been in a segregation unit for reported violation of prison rules for various lengths of time.

6. An inmate in the S.T.A.R.T. program who refuses to participate in the program, or one who consistently demonstrates inability to participate in the program and does not progress above the Orientation Level (previously designated as Level I) for a period of one year is recommended to the Coordinator of Mental Health of the Bureau for removal from the program. Further, each inmate within the program is constantly observed and monitored by the institutional staff, and a similar recommendation may be made to the Coordinator of Mental Health for an inmate's removal prior to a period of one year for reasons which reflect the inmate's inability to achieve the goals of the program.

7. No prisoner is permitted to leave the S.T.A.R.T. unit for the purpose of attending religious services. Prisoners' ability to practice their religion is limited to the allowance of individual services provided by the institutionally employed Catholic and Protestant chaplains on request. However, a prisoner can individually practice his own religious belief except where same interferes with the security or orderly operation or rules of the institution in accordance with Policy Statement # H–7300.38, September 8, 1972. The S.T.A.R.T. program does not provide Muslim petitioners with any opportunity to consult with or to seek guidance from Muslim spiritual leaders. S.T.A.R.T. does not allow those petitioners on the Orientation Level to decorate their cells with the flag of Islam, or free association with members of Muslim faith who are also in the S.T.A.R.T. program.

8. A prison inmate on the Orientation Level is prohibited from possessing, reading, or otherwise using political and educational literature, for example, *Ebony* and *Jet*; religious materials, such as *Muhammed Speaks*; educational materials, including those kept by the Medical Center Education Department for prisoners' use; and political publications, such as books on the rights of Chicanos, and Marxist writings. However, a prisoner in the S.T.A.R.T. program at the Orientation Level is entitled to a subscription to his hometown newspaper and a Bible of a recognized religion, except petitioner Ruiz states he was denied a Bible on entry to the program. As a prisoner progresses from the Orientation Level he is entitled to participate in educational programs and entitled to possess, read, and utilize educational, political, and other material.

9. A prisoner in the S.T.A.R.T. program may freely express his opinions, except where staff determines that same interferes with the orderly operation of the program, and is entitled to correspond by mail as other inmates in open population subject to the same regulations of inspection as provided by Respondent's Policy Statement·# H–7300.-23B and Bureau of Prisons Policy Statement # 7300.1A.

10. A prisoner in the S.T.A.R.T. program has the opportunity to view televi-

sion and possess and utilize a radio on progression from the Orientation Level. Inmates in regular segregation status do not have the opportunity to view television.

11. A prisoner in the S.T.A.R.T. program has the same rights to visitation from others as an inmate in open population with the visitation to take place in a room within the S.T.A.R.T. unit.

12. A prisoner's actions, including his communication with others in the S.T.A.R.T. program, are under continual surveillance for the purpose of determining the inmate's rate of progress.

13. The ratio of correctional officers to prisoners is one to two, and higher than the ratio of correctional officers to prisoners in other segregation units.

14. Prisoners in the S.T.A.R.T. program are subject to searches of their cells to include personal property and legal material; however, Medical Center policy requires the legal material to be inspected for contraband only and not read; and also their bodies, including body cavities on the demand of the S.T.A.R.T. and other institutional correctional staff, as any other inmate in open population for purposes of security and respondent's policy. Body searches are not made by or supervised by a physician or a physician's assistant.

15. The facilities provided in the present ward consist of an open interior, 72 feet in length north and south by 26 feet east and west with two tiers of cells on the east and west sides for a total of 37 cells. The interior is illuminated by natural and electric light.

16. The ward and cell air circulation, temperature, and humidity are designed to be controlled by air conditioning and heat.

17. Each cell in the ward has a tiled interior and measures 10 feet in length by 6 feet in width by 8 feet, 4 inches in height.

18. Each cell on the ward has a solid metal door with a window, 12 inches by 8 inches, permitting the prisoner in the cell observation of the unit, and one window measuring 24 inches by 36 inches to the rear, opening to the exterior building, allowing sunlight and exterior observation of the yard area. The door windows of the cells of selected prisoners were covered with opaque material for a period of time up to and including six weeks in duration for the purpose of preventing disturbance of other inmates participating in the program, resulting in isolation of those prisoners.

19. Each cell in the ward is provided with a toilet as well as a lavatory for the prisoner's use.

20. Cells in the S.T.A.R.T. unit are equipped with a 60 watt light bulb and a 15 watt light bulb. Cells in the segregation unit at the Medical Center are equipped with a 75 watt bulb and a red 15 watt night bulb. Cells in open population at the Medical Center are equipped with one 75 watt bulb.

21. The Medical Center's kitchen is the source for food for all Medical Center prisoners, including S.T.A.R.T. prisoners.

22. A prisoner in the S.T.A.R.T. program is required to clean his cell and the ward area, and is provided an opportunity to earn pay and extra meritorious good time credits on his sentence by being required to work in the Federal Prisons Industry, after being promoted from the Orientation Level. Prisoners in the S.T.A.R.T. program who were sentenced in states that do not recognize good time allowances are also required to work in the Federal Prison Industries. Inmates in regular segregation status and not all prisoners in open population have the opportunity, nor are they required to work in Federal Prison Industries.

23. A prisoner, under the revised program, has the opportunity to be promoted from the Orientation Level within a one week period and to be graduated from the program within approximately nine months from his entrance.

24. Statutory good time cannot be returned to subjects on the Orientation

Level of the S.T.A.R.T. unit. However, statutory good time has been on occasion returned to segregation prisoners and may be returned to open population prisoners in all Federal Bureau of Prisons institutions. All of an inmate's statutory good time is recommended by the S.T.A.R.T. staff to be returned to him on his successful graduation from the unit.

25. Commissary privileges are denied to inmates on the Orientation Level of the program. Commissary privileges are increased with the inmate's progression within the levels to the point as allowed an inmate in open population.

26. Each inmate on the Orientation Level of the program is provided the opportunity to shower a maximum of twice weekly with a clothing change, except petitioner Sanchez states these opportunities were not provided him originally for a period of time, which respondent denies. This is the minimum bathing and clothing exchange required of those in segregation in accordance with the Policy of the Bureau of Prisons. [See Policy Statement # 7400.5B]. As an inmate progresses from the Orientation Level within the program, he is granted increasing privileges of bathing and changing of clothing to the point of an inmate in open population.

27. An inmate within the program at the Orientation Level is provided a maximum of recreation for a one hour period twice weekly, except certain petitioners, Sanchez, Ruiz, McDonnell, and Wilson state that their full two hour exercise was not provided them, which respondent denies. This is the minimum exercise required of those in segregation in accordance with the Policy of the Bureau of Prisons [See Policy Statement # 7400.5B]. As an inmate progresses from the Orientation Level within the program, he is granted increasing privileges of recreation to the point of an inmate in open population.

28. Each prisoner in the unit is provided a bed, a mattress, a pillow, two blankets, and a personal locker, except where the locker has been previously destroyed or for other security reasons. All prisoners, including those on the Orientation Level are provided the following personal items: a tooth brush, tooth powder, institution tobacco, cigarette paper, match books, a Bible of a recognized religion, pencil and paper, and their own legal material, except named petitioners state that they were not provided with all or some of these items for a period of time, which respondent denies. Prisoners are granted the right to possess greater amounts of personal property as they progress from the Orientation Level, the amount granted at the Orientation Level is the same as the minimum granted a prisoner under the Policy of the Bureau of Prisons. [See Policy Statement # 7400.5B].

29. S.T.A.R.T. subjects are prohibited from visiting the prison library, including the law library. They may request law books from the staff and the assistance of the Federal Public Defender.

## IV.

The first question of law stipulated by the parties is:

Whether, in the absence of notice, charges, and hearings, the selection and forceable transfer of a prisoner into the S.T.A.R.T. program violates the constitutional rights of the prisoner in denying him due process and equal protection of law.

Petitioners argue that due process required a hearing before their transfer into S.T.A.R.T. in the first place because the program involves substantial losses of privileges to the petitioner.[1]

Respondents argue, on the other hand, that no deprivation of due process is involved because all petitioners were in

---

1. We shall describe all prisoners as "petitioners" and the persons sued as "respondents" for convenience sake, although technically, because of the form of a particular action, particular prisoners may be properly called "plaintiffs" and the opposing parties "defendants."

segregation in other federal correctional institutions before their transfer to S. T.A.R.T. at the Medical Center. They further argue that the Bureau of Prisons has broad discretion in the transfer and placement of prisoners within the federal prison system under 18 United States Code § 4081, and that the exercise of that discretion is not subject to judicial review. Respondents attempt to distinguish petitioners' cases on their facts but do not discuss the substantial constitutional questions raised by those cases.

■■ We find and conclude that this question of law relating to transfer without any sort of a hearing is not mooted by the termination of the S.T.A.R.T. program under the particular factual circumstances and the principles of law stated in part II above. On the merits, we find and conclude that a prisoner transferred into S.T.A.R.T. or into a behavior modification program like S.T.A.R.T., which, on the facts, involves a major change in the conditions of confinement is entitled, at a minimum, to the type of hearing required by the Supreme Court's opinion in Wolff v. McDonnell.

Even before the Supreme Court decided Wolff v. McDonnell, it was reasonably clear that the transfer of a prisoner without any sort of a hearing to another institution or to a different status within the same institution presented a substantial constitutional question when, on the facts, the transfer was accompanied by deleterious consequences to the prisoner. Prior to Wolff v. McDonnell, several courts held that prisoners must be given some form of hearing when they are disciplined, e. g., Miller v. Twomey, 479 F.2d 701 (7th Cir. 1973); McDonnell v. Wolff, 483 F.2d 1059 (8th Cir. 1973); cert. granted 414 U.S. 1156, 94 S.Ct. 913, 39 L.Ed.2d 108 (1974); Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971); cert. denied 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971). Other courts specifically concluded that hearings were required in connection with prisoner transfers; e. g., Hoitt v. Vitek, 361 F.Supp. 1238 (D.N.H.1973); White v. Gillman, 360 F.Supp. 64 (S.D.Iowa 1973); Capitan v. Cupp, 356 F.Supp. 302 (D.Or.1972); Park v. Thompson, 356 F.Supp. 783 (D. Hawaii 1973); Gomes v. Travisono, 353 F.Supp. 457 (D.R.I.1973). Cf. Bryant v. Hardy, 488 F.2d 72 (4th Cir. 1973). Still other courts, prior to Wolff v. McDonnell, required that a hearing be held in connection with administrative changes in status. Urbano v. McCorkle, 334 F.Supp. 161 (D.N.J.1971). See also Landman v. Royster, *supra*, 333 F.Supp. at 645.

This development in the law, as illustrated by the cited cases, has, of course, been recent. Most of the cases cited above were decided after and upon the authority of Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); and Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

The Eighth Circuit in McDonnell v. Wolff, 483 F.2d 1059 (8th Cir. 1973), consistent with the Seventh Circuit's earlier opinion in Miller v. Twomey, 479 F.2d 701 (7th Cir. 1973) concluded that the procedural requirements outlined in *Morrissey* as supplemented in *Scarpelli, supra,* should be applied in connection with prison disciplinary proceedings. While the Supreme Court concluded in Wolff v. McDonnell that "the *Morrissey-Scarpelli* procedures need not in all respects be followed in disciplinary cases," that case also concluded that particular portions of those procedures must be satisfied in order to meet the minimum requirements of procedural due process in regard to disciplinary confinement of state prisoners.

The fact that state prisoner disciplinary confinement was involved in Wolff v. McDonnell does not make the principles stated in that case inapplicable to transfers of federal prisoners to S.T.A.R.T. even though S.T.A.R.T. may be labeled a "treatment" program. For, as the majority opinion in Wolff v. McDonnell recognized in footnote 19 on

page —— of —— U.S., 94 S.Ct. on page 2982 a "realistic approach" must be adopted in the determination of cases of this type, and that "it would be difficult for purposes of procedural due process to distinguish between the procedures that are required where good time is forfeited and those which must be extended when solitary confinement is at issue." Solitary confinement was there recognized as a factual circumstance which "represents a major change in the conditions of confinement," which called into play "minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction." [2]

█ The fact that the Bureau of Prisons may view or label a transfer to a behavioral modification program such as S.T.A.R.T. as a "treatment program" for a prisoner's benefit rather than as a sanction or as some form of punishment is not a relevant factor in the determination of the due process question involved. The relevant consideration under the Supreme Court's standards articulated in Wolff v. McDonnell is whether, on the facts, the transfer to a behavioral modification program involves a major change in the conditions of the prisoner's confinement.

█ Under the factual circumstances of this case, which are virtually undisputed, we find and conclude that the transfer of the petitioner to S.T.A.R.T. did involve a major change in the conditions of confinement of each petitioner, even though he may have been in segregation in the institution from whence he was transferred and that each transfer, made without any sort of hearing, violated the minimum requirements of due process to which he was entitled under the Constitution.

Bureau of Prisons Policy Statement # 7400.5B provides that reading materials are available to prisoners in regular segregation on a circulating basis. When S.T.A.R.T. prisoners were placed at the Orientation Level of S.T.A.R.T., they were permitted to have only a Bible and a hometown newspaper. Religious services are available to most inmates in segregation. In S.T.A.R.T. no inmate could leave the S.T.A.R.T. section of the institution to attend religious services. The S.T.A.R.T. program, contrary to rights of a prisoner in segregation, did not provide Muslim participants with any opportunity to consult with or seek guidance from Muslim spiritual leaders.

Participants in S.T.A.R.T. as other inmates are subject to cell and body searches at any time deemed appropriate by the staff. Unlike ordinary segregation inmates, however, S.T.A.R.T. participants are subjected to having all their activities and speech continuously monitored. The fact that such monitoring serves the purpose of determining a participant's rate of progress within the program does not make it any less a difference in the conditions of his confinement.

When a prisoner was transferred to S.T.A.R.T. from segregation he was immediately faced with the prospect of not having open population privileges until he had, in effect, successfully completed the program. In S.T.A.R.T., contrary to the situation of a prisoner in segregation, open population privileges were granted piecemeal, provided, of course, that a particular S.T.A.R.T. participant would be able successfully to move to the upper Levels of the program. To successfully move through S.T.A.R.T., he must, to the satisfaction of the Staff, participate in a "full, highly-structured and intense program in areas of work, treatment, education, and recreation." [Court Exhibit # 6, S.T.A.R.T. Program as of August 17, 1973, page 3].

---

2. The significance of footnote 19 is underlined by footnote 1 on page —— of —— U.S., 94 S.Ct. on page 2987 of Mr. Justice Marshall's dissent, in which Mr. Justice Brennan joined, stated agreement with the apparent majority holding that "inmates' 'liberty' is protected by due process whenever 'a major change in the conditions of confinement' is imposed as punishment for misconduct." We read the majority opinion as it was read by Mr. Justice Marshall.

An inmate in segregation, on the other hand, was not and could not be subject to such conditions and could not lawfully be required to so participate in order to regain the privileges of inmates in open population. Forced participation in a behavioral modification program such as S.T.A.R.T. to obtain privileges given to prisoners in open population, we conclude, constitutes a major change in the conditions of a prisoner formerly held in segregation.[3]

Forced participation in S.T.A.R.T. was obviously designed to accomplish a modification of the participant's behavior and his general motivation. He was forced to submit to procedures designed to change his mental attitudes, reactions and processes. A prisoner may not have a constitutional right to prevent such experimentation but procedures specifically designed and implemented to change a man's mind and therefore his behavior in a manner substantially different from the conditions to which a prisoner is subjected in segregation reflects a major change in the conditions of confinement.

We believe that it is equally clear from the facts that behavior modification programs patterned upon the theories upon which S.T.A.R.T. was based must, when viewed realistically, involve major changes in the conditions of confinement of a particular federal prisoner. While it may be difficult for anyone who has never seen a segregation unit in a prison to imagine that any other sort of confinement could be more restrictive, the undisputed factual circumstances establish that the conditions under which the S.T.A.R.T. petitioners were confined, particularly when they were held at the Orientation Level (or Level I, as originally designated) reflected a major change from the manner they were held in a regular segregation unit at their former institution. Certainly similar major changes in confinement must be contemplated in regard to the future behavioral modification programs anticipated by the Bureau of Prisons, else there would be no occasion to transfer prisoners already held in a segregation unit at Atlanta, for example, to another and different type of closed unit located in the Medical Center at Springfield, Missouri, or to be located at the new Federal Center for Correctional Research at Butner, North Carolina, when that institution will finally be opened later this year.

## V.

Wolff v. McDonnell recognized that "as the problems of penal institutions change and correctional goals are reshaped, the balance of interests involved" may change (p. —— of —— U.S., p. 2980 of 94 S.Ct.). The Supreme Court's suggestion that "the better course at this time, in a period where prison practices are diverse and somewhat experimental, is to leave those matters to the sound discretion of the officials of state prisons," (p. —— of —— U.S., p. 2981 of 94 S.Ct.) may not properly be read as an admonition that courts return to the now almost forgotten "hands off" policy which characterized prison litigation in the past. For Wolff v. McDonnell explicitly stated that the judicial discretion "to leave the continuing development of measures to review adverse actions affecting inmates to the sound discretion of corrections officials"

---

3. The National Advisory Committee on Criminal Justice Standards and Goals, even prior to Wolff v. McDonnell, recommended that hearings be held in the case of nondisciplinary changes of status involving "substantially adverse changes in degree, type, location, or level of custody." They discuss the purpose of such procedures as follows:

The area of nondisciplinary classification and status determination long has been considered a proper subject for the diagnostic, evaluation, and decisional expertise of correctional administrators and specialists. Yet decisions of this kind can have a critical effect on the offender's degree of liberty, access to correctional services, basic conditions of existence within a correctional system, and eligibility for release. [National Advisory Committee on Criminal Justice Standards and Goals, Corrections, Standard 2.13, pp. 54–55 (1973)].

was expressly limited by the minimum due process standards set forth in that opinion (p. —— of —— U.S., p. 2981 of 94 S.Ct.).

Wolff v. McDonnell took notice of the concern of the Federal Government "to avoid situations that may trigger deep emotions and that may scuttle the disciplinary process as a rehabilitative vehicle" (p. —— of —— U.S., p. 2980 of 94 S.Ct.).

Consistent with the observations of the Supreme Court in Wolff v. McDonnell, we believe it appropriate to state that in spite of the careful criteria established for S.T.A.R.T. and the obvious care exercised by the Bureau of Prisons in its selection of S.T.A.R.T. participants, and the obvious good faith motivations which called S.T.A.R.T. into being, the establishment of S.T.A.R.T. did trigger deep emotions which were fanned by a great deal of uninformed and inaccurate publicity. The Director of the Bureau of Prisons believed it necessary to counter the current inaccuracies concerning the rehabilitative programs of the Bureau, including, but not limited to S.T.A.R.T., by stating emphatically that "the Bureau of Prisons never uses and does not countenance the use of psychosurgery, electro-shock, massive use of tranquilizing drugs or any other form of aversive treatment to change behavior, no matter how aggressive or resistive an offender may be." This Court has received more mail in connection with these cases than the combined mail received in connection with all of the other cases it has handled over the past twelve years. Much of that mail was obviously prompted by organizational appeals. Most of it reflected a conviction, perhaps honestly maintained, that the writers of the letters simply did not and would not accept Mr. Carlson's statement of simple fact.

Because of the obvious and highly commendable concern of the Federal Bureau of Prisons to develop innovative, humane, and effective correctional programs for offenders committed to its custody, we are confident that appropriate consideration will be given to whether procedures under which transfers to programs which will correct the mistakes of S.T.A.R.T. and which will reflect the benefit of the experience gained before the Bureau's voluntary termination of that program, should include much more than the minimal due process requirements mandated by Wolff v. McDonnell. We are confident that the Bureau will give appropriate consideration to whether it will not only comply with Wolff v. McDonnell's requirement that written records of the proceedings be maintained (p. 23 of the slip opinion) but that it will also give appropriate consideration to designing new procedures and appropriate Policy Statement guidelines which will insure that those written records will include accurate factual information concerning the nature of the program and the reasons why and the manner in which participants are selected which will tend to establish at the outset that there is no legitimate reasonable basis for the emotional reaction prompted by S.T.A.R.T.

For the reasons we have stated, an appropriate order will be entered granting a declaratory judgment in regard to the first stipulated question.

## VI.

The second question of law stipulated by the parties is:

> Whether a prisoner selected to participate in the S.T.A.R.T. program has a right to freely withdraw at any time without penalty of any kind and to be transferred from the program.

Petitioners generally contend that involuntary programs such as S.T.A.R.T. and other involuntary programs designed on the same general theory cannot be operated by the Bureau of Prisons consistent with constitutional principles embodied in the First, Fourth, and Ninth Amendments, among others, and that the stipulated question must be answered in the affirmative. Petitioners properly state that material issues of fact are controverted in regard to the question presented and that, therefore

further proceedings are required and should accordingly be directed.

■ We refuse to direct further proceedings in regard to the second stipulated question because that question was mooted by the voluntary termination of the S.T.A.R.T. program. All petitioners have been returned to their respective institutions. No relief in the form of voluntary withdrawal is possible to grant. We have declared that in connection with the first stipulated question that an appropriate hearing is required before transfer into any new program generally comparable to S.T.A.R.T. The question of whether S.T.A.R.T., as it was actually operated, violated the Eighth Amendment is not a recurring controversy. For the resolution of that question in regard to some new program will involve a very precise examination of the specific factual circumstances involved in the new program, when and if challenged. Cf. Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968).

A program patterned on the experience of S.T.A.R.T. may be instituted by the Bureau of Prisons at some future time but that a program exactly like S.T.A.R.T. will be instituted is highly unlikely. An examination of a possible program to determine its susceptibility to an Eighth Amendment challenge is impossible. Specific facts are not available under the circumstances. We find and conclude, therefore, that the second stipulated question is moot.

### VII.

The third question stipulated by the parties is:

Does the S.T.A.R.T. program as designed and applied violate any of the following federally protected constitutional rights of an inmate placed there?

A. Freedom of Religion.

B. Freedom of Speech and Association.

C. Right to be Free from Unwarranted Search and Seizure.

D. Right of Privacy.

E. Cruel and Unusual Punishment.

■ We find and conclude for reasons generally stated in part VI above in connection with the second stipulated question that all of the various questions presented by the third stipulated question are moot.

### VIII.

Accordingly, and for the reasons stated, it is

Ordered (1) that petitioners' motion for partial summary judgment should be and is hereby granted with respect to the first stipulated question of whether, in the absence of notice, charges, and hearing, the selection and forceable transfer of a prisoner into the S.T.A.R.T. program violates the constitutional rights of the prisoner in denying him due process. It is further

Ordered (2) that with respect to all other issues presented in the various cases in this litigation, the above styled cases should be and are hereby dismissed as moot. It is further

Ordered (3) that the selection and forceable transfer of a prisoner into a future behavior modification type program patterned on the experience of S.T.A.R.T., in the absence of the minimal due process procedures mandated by the Supreme Court's recent decision in Wolff v. McDonnell, *supra*, should be and is hereby declared a violation of a prisoner's right to due process of the law as guaranteed by the Fifth Amendment to the Constitution.