John E. RENNIE, Plaintiff,

v.

Ann KLEIN, Commissioner of Human Services, Michail Rotov, Director, Division of Mental Health and Hospitals, Richard Wilson, Chief Executive Officer of Ancora Psychiatric Hospital, Max Pepernik, Acting Medical Director of Ancora Psychiatric Hospital, Edward Wallace, Assistant Administrator of Ancora Psychiatric Hospital, and Josefina Bugaoan, Assistant Medical Director of Ancora Psychiatric Hospital, Defendants.

Civ. A. No. 77–2624.

United States District Court,
D. New Jersey.

Nov. 9, 1978.

On Motion for Preliminary Injunction
Dec. 12, 1978.

Stanley C. Van Ness, Public Advocate, by Sheldon Gelman, Asst. Deputy Public Advocate, Trenton, N. J., for plaintiff.

John J. Degnan, Atty. Gen. of N. J., by Steven Wallach, Deputy Atty. Gen., Trenton, N. J., for defendants.

## OPINION

BROTMAN, District Judge.

This matter is before the court on the motion of plaintiff, John E. Rennie, for a preliminary injunction pursuant to Fed.R. Civ.P. 65. Plaintiff is an involuntary patient of Ancora Psychiatric Hospital, a state institution. He seeks to enjoin the defendant psychiatrists and officials at Ancora from forcibly administering drugs to him in the absence of an emergency situation. The complaint is grounded on 42 U.S.C. § 1983, with jurisdiction pursuant to 28 U.S.C. § 1343. The following are the court's findings of fact and conclusions of law, Fed.R.Civ.P. 52.

## FINDINGS OF FACT

### I. *Procedural History*

The complaint in this action was filed on December 22, 1977. While the complaint is stated in six counts, plaintiff essentially charged defendants with violations of four rights: (1) the right to refuse medication in non-emergent circumstances, (2) the right to treatment, (3) the right of access to counsel, and (4) the right to be free from physical abuse while in custody.

On the same date, counsel for Mr. Rennie, Sheldon Gelman of the New Jersey Public Advocate's Office, and counsel for the state officials, Steven D. Wallach, Deputy Attorney General, appeared in chambers on an application for a temporary restraining order. The parties agreed that only the issue of the right to refuse medication would be considered on the motion for a preliminary injunction. In an order prepared that day and filed December 30th, it was ordered that plaintiff not be medicated against his will beyond a maintenance dosage except in emergencies. Counsel agreed, after consultation with the state psychiatrists, that a maintenance dosage would be 15 mg. of prolixin hydrochloride per day. Dr. Marvin Greenberg, plaintiff's expert, was named temporary consultant to the court.

On January 13, 1978, hearings on the motion for preliminary injunction began. The court conducted fourteen days of hearings; the final day was April 28, 1978. Testimony was taken from hospital officials and employees; three Ancora psychiatrists, Dr. Rotov, Director of the state Division of Mental Health and Hospitals, three psychiatrists from outside the state system produced by plaintiff, and two outside psychiatrists produced by defendant.[1] Counsel were then allowed to prepare proposed findings and briefs.

During the lengthy course of these hearings, plaintiff attempted suicide by swallowing an overdose of pills on April 10, 1978. Transcript, Volume X, page 5, April 12, 1978 (hereafter cited in the form Tr. X, 5, 4/12/78). Defendants moved to remove the temporary restraining order on April 12. Instead, the court reserved decision and requested that all doctors involved in Mr. Rennie's case convene on April 14, to attempt to reach a consensus on the future course of plaintiff's treatment. The psychiatrists agreed that plaintiff should be treated immediately with an antidepressant medication, followed by the use of lithium carbonate when his depression lifted. There was disagreement over when an antipsychotic drug should be used. On the representation that the lithium—antidepressant regime would be commenced and that plaintiff consented thereto, the temporary restraining order was dissolved by order dated April 18, 1978.

It should be noted that on April 12, Dr. Max Pepernik, Medical Director of Ancora, had stated that if any antipsychotic medi-

---

1. Drs. Greenberg, Pepper, and Limoges were called by plaintiff. Drs. Stinnett and Heller were the state's two outside consultants.

cation (these drugs are also called "psychotropics") were resumed as treatment, it would not be prolixin because of plaintiff's aversion to that drug. Tr. X, 14. Based on the hearings, the court certainly agrees that this is appropriate. However, much of the court hearing was devoted to examining studies of this particular drug. Defendants argue that, to the extent plaintiff seeks to enjoin the use of prolixin, this case is moot since defendants are not now using that drug and have indicated no plans to do so. Defendants' Proposed Findings of Fact, No. 23, June 23, 1978.

On May 19, 1978, plaintiff brought the parties before this court seeking to restrain the hospital's use of thorazine, another psychotropic drug. Since the April 28 hearing, it was reported that the hospital gave Mr. Rennie every possible chance on lithium but that he was dangerous to himself, other patients, and the staff. After placing Mr. Rennie in restraints for three days, the decision was made to medicate him with thorazine. Relief was denied plaintiff pending briefing by the parties and the issuance of this opinion, unless plaintiff was prepared to put forward further medical testimony. Thus, while the issue as to prolixin may be moot, defendants have used other drugs of the same type since April. Since the testimony indicates that the benefits and detrimental side effects of all psychotropic drugs are similar, the case as a whole is not moot.

## II. *The Plaintiff's Personal History*

John Rennie is a highly intelligent[2] 38 year old white divorced male. Before his psychiatric difficulties began, he worked as a pilot and a flight instructor. His first symptoms of mental illness appeared in December 1971. Def. Exh. 2, Case History. Serious problems commenced early in 1973, in the wake of his twin brother's death in an airplane accident.

His medical history is lengthy and can only be highlighted here. His first admis-

sion to Ancora Psychiatric Hospital was on April 1, 1973. He was depressed and suicidal, and diagnosed as a paranoid schizophrenic. Mellaril, an antipsychotic drug, was given, and plaintiff was released on April 5 to the Fairmont Farms Hospital, a private facility. Def. Exh. 2; Testimony of Dr. Ortanez, Tr. II, 100, 1/19/78.

There followed a revolving door series of readmissions and releases. His second admission was from May 2, 1973 to June 1, 1973, with plaintiff exhibiting similar suicidal ideas and religious delusions. By his third admission, from February 18 to February 26, 1974, he began to exhibit some aggressive and abusive symptoms. Thorazine, another antipsychotic drug, was used. Delusions that he was Christ continued in the fourth admission in March 1974. Tr. II, 102–04.

Subsequent admissions showed further trials of different medicines. During the sixth admission, from April 9 to May 7, 1974 on a voluntary commitment, there is the first indication of a refusal to take medication. He was discharged against medical advice. His eighth admission, on a voluntary commitment from August 26 to September 10, 1974, was initiated when the Secret Service brought him to state authorities after he threatened to kill President Ford. His behavior again was abusive and assaultive. This type of assaultive behavior continued during his ninth admission from September 18 to October 12, 1974, so that the hospital placed him on homicidal precautions. Def. Exh. 2; Testimony of Dr. Ortanez, Tr. II, 100–04. He was also on homicidal precautions during his tenth admission in January 1975. His eleventh admission was involuntary and lengthy, from November 16, 1975 to June 9, 1976. His behavior was erratic, alternating between being depressed and suicidal to manic and homicidal. There was a suicide attempt on December 14 by an overdose of mellaril. Ortanez, Tr. II, pp. 37–38. Both psychotropic drugs, such as haldol, mellaril and

---

2. Testimony of Dr. Marvin Heller, Tr. XIII, 23, 4/25/78. No dulling of the intellect or reduction in IQ has appeared throughout the course

of his psychiatric difficulties. Testimony of Dr. Marvin Greenberg, Tr. I, 77, 1/13/78.

prolixin decanoate, as well as lithium, were utilized. During this hospitalization, his diagnosis for a time was changed to manic depressive illness. Def. Exh. 2.

Throughout this period, plaintiff was inconsistent in his attitude toward the various medications, refusing at times and cooperating at others. Ortanez, Tr. III, 101. One of many causes of his repeated discharges and readmissions is his failure to continue taking medications after he has left the hospital's custody.

Plaintiff's twelfth and present admission to Ancora began on August 10, 1976, pursuant to an involuntary commitment. N.J. S.A. 30:4–27. Although committed, he has never been declared incompetent. See N.J. S.A. 30:4–24.2(c). The admitting diagnosis was manic depressive illness, circular type. He was placed on lithium and on suicidal and homicidal precautions. Later psychotropic drugs were added. Again, at various times, medication was refused. In December 1976, the Public Advocate's Office became involved in Mr. Rennie's case. After conversation with Mr. Gelman, the hospital agreed that medication would not be forced against the patient's will. Following an injection of prolixin decanoate on January 5, 1977, plaintiff became extremely psychotic and threatened suicide. During 1977, plaintiff was shifted between a number of medications, including thorazine, prolixin, etrafon, haldol, elavil, and lithium. Frequent incidents of fights with other patients and attendants were reported. Suicidal and delusional periods were also reported.

One particular incident prior to the commencement of this lawsuit should be noted. On November 17, 1977, plaintiff reported that evening shift attendants beat him with sticks while he was tied to a bed. The next day he pointed out the sticks, which were hidden at the nurses' station. Tr. IX, 7, 4/12/78. The investigation that followed resulted in the suspension of one employee for three days. Plaintiff and the attendant remained together in the same ward. Tr. IX, 45; Tr. II, 81.

In brief fashion, this summarizes plaintiff's history to December 1977, when this suit was commenced. The events of that month will be discussed further, infra.

### III. Ancora Psychiatric Hospital

Ancora Psychiatric Hospital is a state facility for the mentally ill in Hammonton, New Jersey. It has been accredited by the Joint Commission on Accreditation of Hospitals. Dr. Ortanez and Dr. Bugaoan were the patient's treating psychiatrists during the time relevant to this litigation.

During most of his current admission, plaintiff has been housed in a barren, bleak ward; it has been described as more like a prison than a hospital. Greenberg, Tr. I, 46–7. Plaintiff sometimes has difficulty obtaining a pillow for his bed. His days contain long blocks of unproductive and unstructured time. Testimony of John Rennie, Tr. XIV, 165–67, 4/28/78. In general, doctors at Ancora do not have sufficient time for each patient. Testimony of Dr. Josefina Bugaoan, Tr. V, 61–63, 1/17/78. However, as a result of this lawsuit, the doctors are spending more time with Mr. Rennie. Tr. V, 64–65.

### IV. The Medication

#### A. Benefits of Psychotropic Drugs

Prolixin or Fluphenazine belongs to a group of chemicals variously described as antipsychotic or psychotropic drugs. It comes in long-acting (prolixin decanoate) and short-acting (prolixin hydrochloride) form. Prolixin Decanoate is the only psychotropic drug to come in a form that will last approximately two weeks. Bugaoan, Tr. IV, 124, 1/16/78; Zander, Prolixin Decanoate: A Review of the Research, in 2 Mental Disability L.Rep. 37 (1977).

Many other major tranquilizers exist which are very similar to prolixin hydrochloride, both in therapeutic action and side effect. Plotkin, Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment, 72 Nw.U.L.Rev. 461, 475 (1977). These include thorazine, mellaril, haldol and trilafon. There is no evidence supporting

the superiority of any one of these drugs. Bozzuto, *Use of antipsychotic agents for schizophrenia,* 1977 Drug Therapy 40.

In the past twenty years, psychotropic drugs have played an increasingly important role in the treatment of mental illness, and are now widely used. Psychotropic drugs tend to shorten hospital stays and allow patients to function in the community. Many consider use of these drugs necessary in any treatment program, especially for schizophrenics. Winick, *Psychotropic Medication and Competence to Stand Trial,* 1977 Am.B.Found.Res.J. 769, 773–74; Zander, *supra.* Dr. Stinnett went so far as to testify that the failure to treat an acutely psychotic patient with drugs would be malpractice, Tr. XI, 85; *see also,* Tr. II, 145 (quoting a 1976 National Institute of Mental Health report); *cf. Whitree v. State,* 56 Misc.2d 693, 290 N.Y.S.2d 486, 501 (1968); *Nason v. Superintendent of the Bridgewater State Hospital,* 353 Mass. 604, 233 N.E.2d 908, 910 (1968).

More studies exist demonstrating the efficacy of the psychotropic drugs in the treatment of schizophrenia than for any other mode of treatment. DuBose, *Of the Parens Patriae Commitment Power and Drug Treatment of Schizophrenia: Do the Benefits to the Patient Justify Involuntary Treatment?,* 60 Minn.L.Rev. 1149, 1167 (1976). Defendants offered a number of studies establishing the efficacy of prolixin in the treatment of schizophrenics. May, et al., *Schizophrenia—A Follow-up Study of Results of Treatment,* 33 Arch. Gen'l Psychiatry, 474, 474–78, 481–86 (1976); *Bozzuto, supra* at 44; E. Spohn, et al., *Phenothiazine Effects on Psychological and Psychophysiological Dysfunction in Chronic Schizophrenics,* 34 Arch. Gen'l Psychiatry 633 (1977). *See also* Zander, *supra.*

Of course, the research is not conclusive. Double blind testing is difficult because a placebo group will not experience the usual side effects. Thus the patient and the testers may know that he is unmedicated. Also no studies can conclusively compare the pain of schizophrenic mental states and physical side effects of medication simply because both are subjective experiences. Zander, *supra* at 41; Stinnett, Tr. XI, 81. Furthermore, new studies raise questions about recidivism and the efficacy of using psychotropic medication in every case. Gunderson, *Drugs and Psychosocial Treatment of Schizophrenia Revisited,* Dec. 1977 Psychiatry Digest 25; Simpson, et al., *Psychotic Exacerbation Produced by Neuroleptics,* 37 Diseases of the Nervous System 367 (1976). Patients do react idosyncratically to any particular psychotropic drug. Plotkin, *supra* at 475.

However, the court can appropriately make certain generalizations even at this stage of scientific knowledge. Psychotropic drugs are effective in reducing thought disorder in a majority of schizophrenics. With first admission patients, success rates of as high as 95% have been obtained. *See* May, *supra*; DuBose, *supra* at 1176. Success rates are less impressive with chronic patients. DuBose, *supra* at 1173. However, no other treatment modality has achieved equal success in the treatment of schizophrenics. *Cf.* Bugaoan, Tr. IX, 153–54 (quoting from Hollister, *Choice of Antipsychotic Drugs,* 127 Amer.J. Psychiatry 104, 104 (1970)).

Furthermore, psychotropic drugs are required in order for some patients to effectively participate in and benefit from other types of therapy, such as individual or group psychotherapy and occupational therapy. Comment, *Forced Drug Medication of Involuntarily Committed Mental Patients,* 20 St. Louis U.L.J. 100, 112 (1975); Winick, *supra* at 781; Ortanez, Tr. III, 92; Testimony of Dr. Max Pepernik, Tr. VII, 29, 2/24/78.

In sum, psychotropic drugs are widely accepted in present psychiatric practice. A. Brooks, *Law, Psychiatry and the Mental Health System* 878 (1974). They are the treatment of choice for schizophrenics today. *Cf.* Testimony of Dr. Bertram Pepper, Tr. VIII, 32, 3/27/78; Pepernik, Tr. VII, 16.

## B. *Side Effects of Psychotropic Drugs*

Unfortunately, all of the psychotropic drugs cause dysfunctions of the central

**1138**

nervous system called extrapyramidal symptoms, as well as other side effects. All these vary among individuals. Zander, *supra* at 39. On the average, among all patients, no one drug is much worse than the others at any given therapeutic dosage.[3]

A number of short term autonomic side effects have commonly been reported. These include blurred vision, dry mouth and throat, constipation or diarrhea, palpitations, skin rashes, low blood pressure, faintness and fatigue. Winick, *supra* at 782 n. 66; Plotkin, *supra* at 476; DuBose, *supra* at 1203; Bugaoan, Tr. V, 84. These side effects tend to diminish after a few weeks. Ortanez, Tr. II, 139; Pepernik, Tr. VII, 23. Sudden death may also be a side effect in rare cases. Stinnett, Tr. XI, 50; Pepper, VIII, 24.

Among the extrapyramidal side effects, the two most common are akinesia and akathesia. Akinesia refers to a state of diminished spontaneity, and feeling of weakness and muscle fatigue. Zander, supra; Rifkin, et al., *Fluphenazine Decanoate, Oral Fluphenazine, and Placebo in Treatment of Remitted Schizophrenics*, 34 Arch. Gen'l Psychiatry 1215, 1216 (1977). Patients with severe cases of akinesia had to be dropped from the Rifkin study of prolixin. Akathesia is a subjective state and refers to an inability to be still; a motor restlessness which may produce a shaking of the hands or arms or feet or an irresistable desire to keep walking or tapping the feet. Pepper, Tr. VIII, 22; Zander, *supra*; Winick, *supra*; Bugaoan, Tr. IV, 36. Both of these side effects are temporary and terminate either during or after the drug regime; the effects can also be treated with antocholinergic or antiparkinsonian drugs such as cogentin. Stinnett, Tr. XI, 95; DuBose, *supra* at 1203. However cogentin has side effects of its own, including blurred vision and salivation. Pepper, VIII, 28.

A potential permanent side effect of prolixin and other antipsychotic medication is tardive dyskinesia. Tardive dyskinesia is characterized by rhythmical, repetitive, involuntary movements of the tongue, face, mouth, or jaw, sometimes accompanied by other bizarre muscular activity. Winick, *supra*; Zander, *supra*; DuBose, *supra*; Greenberg, Tr. I, 28. The risk of this disorder is greatest in elderly patients, especially women, and is associated with prolonged use. Zander, *supra* at 40.

Finally, it should be mentioned that British researchers have suggested a link between prolixin and suicidal depression. Zander, *supra*. It is too early for scientists, much less the court, to draw any firm conclusions from this research. Stinnett, Tr. XI, 37.

### C. Lithium Carbonate

As lithium is another drug previously used and presently recommended by some doctors in Mr. Rennie's case, a short discussion is appropriate. Lithium carbonate is now established as the most effective treatment available for mania, an affective disorder marked by extreme elation, hyperactivity, grandiosity, and accelerated thinking and speaking. It also prevents the recurrence of both the manic and depressive episodes which alternately afflict patients with bipolar manic-depression. Winick, *supra* at 787; Pepper, Tr. VIII, 40; Testimony of Dr. Richard F. Limoges, Tr. XII, 27–29, 4/20/78. However, in a bipolar case, an antidepressant such as tofranil, amitripyene or imipramine must be added to prevent depression. Tr. VIII, 40; Tr. XII, 29.

### V. The Appropriate Treatment for Mr. Rennie

#### A. Plaintiff's Condition as of December 1977

It is at this juncture appropriate to resume the history of Mr. Rennie and the events which raised the forced medication issue. In early December 1977, the staff of Ancora felt that plaintiff was highly homicidal, and that his general condition was

---

**3.** Long-acting prolixin may be worse than the short-acting medications. Zander, *supra* at 39. However, as prolixin has been eliminated as the drug of choice, the court will not focus on this distinction.

deteriorating. Bugaoan, Tr. III, 137–39. On December 5, a meeting was convened attended by Dr. Bugaoan, Dr. Pepernik, Dr. Ortanez, and the members of plaintiff's treatment team to discuss the situation. Ex. D–2; Bugaoan, Tr. IV, 94. The next day, Dr. Pepernik sought and received permission from the Attorney General's office to administer medication without consent. At a hospital treatment team meeting on December 7, a multi-modal treatment plan for plaintiff was formulated, including the administration of prolixin hydrochloride. The decision to compel medication was made to prevent plaintiff from harming other patients, staff, and himself and to ameliorate his delusional thinking pattern. Prolixin was chosen because, in the decanoate form, it is the only injectable long-acting drug. Tr. IV, 121. It was thought that in the post-hospitalization period, it would be easiest to maintain Mr. Rennie on prolixin decanoate, with one injection every two weeks, since he had a history of failing to continue his medication once released. In the month following the initiation of the prolixin regime, Mr. Rennie's condition improved markedly. Ex. D–2; Tr. II, 129–30. After his dosage was lowered to 15 mg/day by the court order of December 30, it was reported that his behavior was controllable. However the staff psychiatrists felt the dosage to be insufficient to treat his thought disorder. Tr. III, 86.

### B. Plaintiff's Diagnosis

Obviously, before drugs can be prescribed, plaintiff's condition must be known. Perhaps the question most contested during the hearings was plaintiff's proper diagnosis. While psychotropic drugs are generally regarded as the treatment of choice for schizophrenia, lithium, with an antidepressant, is the treatment of choice for manic depression. As plaintiff is presently willing to take lithium,[4] this case would be moot if

manic depression were the consensus diagnosis.

As noted earlier, at various times during plaintiff's prior hospitalizations, diagnoses of both schizophrenia and manic depression were offered. There is a thin line between these two illnesses. Pepper, Tr. XIV, 78, 4/28/78. No expert indicated any medical agreement as to whether the two disorders arise from different environmental causes, or represent different physiological states within the brain. Instead, the testimony concentrated on symptomatology. Furthermore, there was little testimony on how the psychopharmacological substances work in the brain. This emphasis on symptoms and lack of certainty about causation and physiopathology demonstrates the tentativeness of much psychiatric diagnosis as compared to the usual physical diagnosis. The experts who testified concerning Mr. Rennie's disorder are in great disagreement. Drs. Heller and Bugaoan believe plaintiff is schizophrenic. Tr. XII, 40. Drs. Ortanez and Pepernik give a diagnosis of schizophrenia, affective type. Tr. III, 71, Tr. X, 109, but Ortanez agrees that plaintiff has also shown a manic depression symptoms at times. Tr. III, 75. Dr. Stinnett diagnoses plaintiff as manic depressive, but offers schizo-affective disorder as a possible alternative diagnosis. Tr. XI, 15. Finally, Drs. Limoges and Pepper feel that plaintiff suffers only from manic depression. Tr. XII, 32; VIII, 31.

There is much overlap between the two diagnoses and disagreement among experts. Manic depression is basically a mood disorder, while schizophrenia is primarily a thought disorder, characterized by delusions, hallucinations, and faulty logic. However, manic depressives can also show thought disorders at the manic end of the mood swing. But, true schizophrenia is

---

4. In the past, Mr. Rennie has refused lithium, stating it made him too depressed. Greenberg, Tr. I, 35. His assessment of the drug was correct. At the time, the hospital apparently would not give him an antidepressant in addition to the lithium. Perhaps as a result of these hearings, all now agree that lithium is

best at curbing the manic side of manic depression, and that in a bipolar case such as plaintiff's, an antidepressant such as tofrinil is also necessary. See Order Dissolving Temporary Restraining Order 4/18/78; Tr. XI, 139; Pepper, VIII, 40; Heller, XIII, 41, 4/25/78; Limoges, XII, 29.

characterized by sustained rather than episodic periods of thought disorder. Further, a manic depressive's periods of thought disorder will be tied to his mood swings, unlike a schizophrenic's cognitive dysfunctions. In addition, schizophrenics can show mood disorder as a secondary symptom. This is called schizophrenia, affective type, or schizo-affective disorder. Stinnett, Tr. XI, 20; Ortanez, Tr. III, 71.

The problem facing the doctors diagnosing Mr. Rennie is obviously complex. Simplified for the lawyer's mind, one of the key inquiries is whether Rennie's assertions that he is the "alpha omega," Tr. VII, 25, or Christ, are firm and fixed schizophrenic delusions or mere grandiosity characteristic of his manic euphoria. Dr. Limoges believes the latter and thus would only prescribe lithium and an antidepressant to combat plaintiff's manic depression. Tr. XII, 26, 118–19.

Dr. Stinnett however testified that while his diagnosis was manic depression, the distinction is largely academic. He found the symptoms to warrant both antipsychotic medication and lithium. An antipsychotic was deemed necessary both to curb the patient's perceived delusions and to control the destructive aspects of his behavior. Tr. XI, 22–23. While Dr. Ortanez lacks Dr. Stinnett's experience and expertise,[5] as the treating physician Dr. Ortanez also believed that both antipsychotics and lithium would be appropriate based on his perception of combined symptoms.

A little knowledge can be dangerous, and this court is hesitant to diagnose mental illness and prescribe medication. But it is possible to draw these conclusions. Plaintiff is acutely psychotic at times. Stinnett, Tr. XI, 135. Aside from his adverse reaction to psychotropics, the best course of treatment for Mr. Rennie would combine psychotropic medication with lithium and an antidepressant. However, the position that he has no fixed delusions, thus making use of a psychotropic unnecessary, is, at the least, a reasonable proposition.

5. In this case, opportunity to observe Mr. Rennie's everchanging symptoms may be the best way to arrive at an appropriate diagnosis.

### C. Use of Pharmaco-therapy as the Sole Therapy

Defendants have produced at least one study, May, *supra*, demonstrating that drugs alone are an effective means of curing schizophrenia. Testimony has also indicated that drugs must be used initially to bring Mr. Rennie into contact with reality before any other therapy may be usefully employed. Bugaoan, Tr. III, 143; Stinnett, Tr. XI, 16; Heller, Tr. XIII, 33.

However, the court rejects any solution to the problems of this case which would allow Mr. Rennie to be treated with an antipsychotropic drug alone. Dr. Stinnett expressed in the strongest possible terms that both pharmacotherapy and psychotherapy would have to be used to improve Mr. Rennie's conditions and not one without the other. The court fully accepts Dr. Stinnett's recommendation. Dr. Pepper concurred in stating that medicine cannot be successful outside of a good total treatment plan. Tr. VIII, 34. Only in the context of a trusting relationship achieved through psychotherapy can medicine be employed in a rational way. Tr. XI, 16.

### D. Plaintiff's Reaction to Psychotropics

John Rennie suffers from many of the side effects described above. He experiences blurred vision and a dry mouth. Rennie, Tr. XIV, 144, 4/28/78. On thorazine, his blood pressure has dropped. Tr. I, 35. He also suffers from akathesia on prolixin, getting uncontrollable tremors. Tr. XIV, 144. This, and the fact that he feels his senses are dulled, are his two principal reasons for refusal of prolixin. Tr. I, 35. Despite the hospital's assertion that Mr. Rennie has faked akathesia, Bugaoan, Tr. IV, 125 this court is convinced that the akathesia is real and extremely unpleasant. Pepper, Tr. VIII, 22; Heller, Tr. XIII, 22. The hospital doctors are to be faulted for ignoring plaintiff's subjective reports of akathesia while on prolixin. Stinnett, Tr. XI, 55.

None of the outside experts besides Dr. Greenberg had this luxury.

Mr. Rennie also has shown wormlike movements of the tongue. This is a preliminary symptom which is possibly indicative that tardive dyskinesia may develop if medication is continued. Pepper, Tr. XIV, 34. Thus, there is a risk of permanent damage from psychotropic medication in Mr. Rennie's case, and Mr. Rennie requires extremely close monitoring if these drugs are to be continued.

### E. The Efficacy of Forced Medication

As noted above, a trusting relationship or therapeutic alliance between psychiatrist and patient is essential for a drug regimen to succeed. Stinnett, Tr. XI, 16; Limoges, XII, 73. Plaintiff has demonstrated that psychotropic drugs are less efficacious in a hostile or negative environment. Stinnett, XI, 35, 108; Pepper, VIII, 57. As a corollary to this, even if the best drug is prescribed, if the patient is unwilling to accept it, the positive effects are greatly lessened, especially in terms of long range benefits. Pepper, Tr. VIII, 76; Limoges, Tr. 72; *O'Connor v. Donaldson*, 422 U.S. 563, 579, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (Burger, C. J., concurring).

### F. Plaintiff's Competency to Make Medication Decisions

John Rennie's psychiatric problems are of a cyclical nature, so that on some days he is psychotic. Dr. Pepper testified that plaintiff's refusal of prolixin is not a product of his mental disorder. Tr. XIV, 123. However, Dr. Stinnett found that during his examination on February 25, 1978, Mr. Rennie was not capable of making a decision on treatment in his best interests. Tr. XI, 112. The court feels that Dr. Pepernik's assessment is most accurate, and that Mr. Rennie's wishes should be taken into account on any treatment decision. But the court finds that his capacity to participate in the refusal of medicine or the choice of medicine is somewhat limited, depending on the day. Tr. VII, 24; *cf.* Shwed, *Protecting the Rights of the Mentally Ill*, 64 A.B.A.J. 564, 566 (1978); Comment, *Forced Drug Medication, supra* at 113. The court does believe that Mr. Rennie's reports of his subjective reactions to particular drugs are generally accurate.

## CONCLUSIONS OF LAW

### I. Introduction—New Jersey Law

A New Jersey state court has recently been faced with a factual situation very similar to this case. *In re Hospitalization of B*, 156 N.J.Super. 231, 383 A.2d 760 (Law Div.1977) involved an involuntarily committed patient who was refusing prolixin. B had not responded to all conventional therapies, and the treating physician sought the court's permission to administer a psychotropic drug. B had not been declared incompetent. N.J.Ct.R. 4:83.

Looking to the New Jersey statutes, the court quoted N.J.S.A. 30:4–24.2(d)(1), which states that:

> No medication shall be administered unless at the written order of a physician. Notation of each patient's medication shall be kept in his treatment records. At least weekly, the attending physician shall review the drug regimen of each patient under his care. All physician's orders or prescriptions shall be written with a termination date, which shall not exceed 30 days. Medication shall not be used as punishment, for the convenience of staff, as a substitute for a treatment program, or in quantities that interfere with the patient's treatment program. Voluntarily committed patients shall have the right to refuse medication.

Based on this statute the court held that involuntarily committed patients do not have the right to refuse medication. Involuntary patients "are protected by nothing more than the court's review, the occasional consultation of an independent expert and the promised administrative procedure." 156 N.J.Super. at 238, 383 A.2d at 764. Thus, plaintiff is proceeding under § 1983 to determine if the state scheme is constitutionally defective.

New Jersey does recognize the emerging right to treatment of mental patients. N.J. S.A. 30:4–24.1; *State v. Carter*, 64 N.J. 382,

393–04, 316 A.2d 449 (1974); *see also Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974).

## II. *Standards on a Preliminary Injunction*

■ Generally, four factors are to be considered on an application for a preliminary injunction: (1) whether the moving party has shown that it is likely to prevail on the merits, (2) whether the movant has demonstrated that he would be irreparably harmed if the preliminary injunction is denied, (3) whether the grant of the injunction would harm other interested parties to a greater extent than it would benefit movant, and (4) whether the public interest would be served. *A. O. Smith Corp. v. F. T. C.*, 530 F.2d 515, 525 (3rd Cir. 1976). Defendants argue that there can be no showing of probability of success on the merits where novel legal issues are raised.

■ Certainly the issue of a federal right to refuse medication is novel and complex. However, the case has not followed the usual course of a preliminary injunction hearing. Hearings have been held on fourteen dates over a period of four months. The court has heard testimony from nine psychiatrists. Counsel have aided the court with excellent briefs. Thus, while more information is always desirable, the court feels that it should not avoid a consideration of the merits in this instance merely because the issues are novel.

## III. *Abstention*

■ Defendants argue that this court should abstain in this case so as to allow a state appellate court to consider the issue. Abstention is only appropriate in narrowly limited special circumstances. *Zwickler v. Koota*, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). It is proper when a federal constitutional claim is premised on an unsettled question of state law and where a state court decision on the state law issue might avoid the constitutional problem. *Frederick L. v. Thomas*, 557 F.2d 373, 381 (3rd Cir. 1977).

■ In this case, the state statute is clear. N.J.S.A. 30:4–24.2(d)(1) provides that voluntary patients may refuse medication, and thus by implication, involuntary patients may not. A recent state case, *In re Hospitalization of B, supra*, has settled the point. The fact that an appellate court has not decided the issue is not dispositive.

■ Furthermore, abstention is discretionary. *Frederick L., supra* at 382. It would be inequitable to send plaintiff back to state court at this stage of the proceedings. Therefore, the court will not abstain.

## IV. *The Federal Constitutional Issues*

The plaintiff alleges numerous constitutional grounds in support of his position. These claims generally track the course charted in *Scott v. Plante*, 532 F.2d 939 (3rd Cir. 1976). *See also Souder v. McGuire*, 423 F.Supp. 830 (M.D.Pa.1976). Scott, a patient of Trenton State Hospital, had five pro se complaints dismissed by the district court. One claim challenged the involuntary administration of medications, including thorazine, mellaril, and trilafon. The Third Circuit, in reversing the motion to dismiss, outlined in dictum how such a claim could establish a constitutional deprivation.

> . . . [E]xisting case law points to at least three [9] conceivable deprivations that may accompany the involuntary administration of such substances by state officers acting under color of state law to inmates confined in a state institution. . . . [T]he involuntary administration of drugs which affect mental processes . . . could amount, under an appropriate set of facts, to an interference with Scott's rights under the first amendment. *See Mackey v. Procunier*, 477 F.2d 877 (9th Cir. 1973); *Kaimowitz v. Dep't of Mental Health*, Civ.No. 73–19434–AW (Mich. Cir. Ct., Wayne County, July 10, 1973). Moreover, on this record we must assume that Scott, though perhaps properly committable, has never been adjudicated an incompetent who is incapable of giving an informed consent

[9] A possible fourth constitutional deprivation might include invasion of the inmate's right to bodily privacy . . . *See, e. g., Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 . . . (1973).

to medical treatment. Under these circumstances due process would require, in the absence of an emergency, that some form of notice and opportunity to be heard be given to Scott or to someone standing *in loco parentis* to him before he could be subjected to such treatment. Finally, under certain conditions, Scott's claim may raise an eighth amendment issue respecting cruel and unusual punishment. *See Knecht v. Gillman,* 488 F.2d 1136 (8th Cir. 1973); *Mackey v. Procunier, supra* at 878.

532 F.2d at 946–47. The court will consider each of these four claims in relation to the facts of this case.

### A. *Cruel and Unusual Punishment*

■ As Dr. Rotov testified, Tr. VI, 141, 2/23/78, there is great potential for the abuse of psychotropic medication, and careful scrutiny is required when they are involuntarily administered. Comment, *Advances in Mental Health: A Case for the Right to Refuse Treatment,* 48 Temp.L.Q. 354, 364 (1975). The court will assume that the eighth amendment prohibition on cruel and unusual punishment does apply to protect persons confined in mental institutions. *See Ingraham v. Wright,* 430 U.S. 651, 669 n. 37, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).

The question is whether use of antipsychotic drugs in plaintiff's case is justified as treatment or whether it can be classified as punishment by the court. *Knecht v. Gillman,* 488 F.2d 1136, 1138 (8th Cir. 1973). A number of cases have found eighth amendment violations despite claims of therapeutic value. *Knecht, supra; Mackey v. Procunier,* 477 F.2d 877 (9th Cir. 1973); *Pena v. New York State Division for Youth,* 419 F.Supp. 203, 207 (S.D.N.Y.1976); *Nelson v. Heyne,* 355 F.Supp. 451, 455 (N.D.Ill.1972). However, each case is clearly distinguishable from the one at bar. In *Knecht,* the drug apomorphine was found to have no proven therapeutic value and its use was not recognized as acceptable medical practice. 488 F.2d at 1138, 1140; *see* Plotkin, *supra* at 494. Furthermore, while the behavior modification program was believed to have long-term benefits, the adverse effects seemed *unnecessarily* harsh. Com-

ment, *The Right Against Treatment: Behavior Modification and the Involuntarily Committed,* 23 Cath.U.L.Rev. 774, 782 (1974). In *Nelson, Pena,* and *Mackey,* the courts found that the drugs were used improperly and for punishment rather than as part of an ongoing psychotherapeutic program. *Cf. Welsh v. Likins,* 373 F.Supp. 487, 503 (D.Minn.1974).

■ In contrast, psychotropic drugs have been proven effective. Furthermore, the Ancora staff has established that they were trying to use prolixin as an integral component of an overall treatment program. While the side effects of prolixin are serious, they are not *unnecessarily* harsh in light of the potential benefits. Accordingly, the court finds no eighth amendment violation. Prolixin was justifiably administered as treatment, not punishment.

### B. *First Amendment*

Another constitutional argument advanced in support of a right to refuse treatment is a first amendment right to freedom of expression, including both the right to communicate and the right to think. Plotkin, *supra* at 494. Plaintiff argues in this case that drugs may be used to punish or suppress truthful expression critical of the institution. Certainly plaintiff has a history of justifiably criticizing hospital procedure. However, there is no evidence that the hospital administered the medications in this case in an attempt to suppress those statements.

Plaintiff also argues that the use of drugs interferes with his mental processes and thus deprives him of his right to mentation. *Kaimowitz v. Dept. of Mental Health,* Civ.No. 73–19434 (Cir. Ct. Wayne County, Michigan July 10, 1973), *reprinted in* A. Brooks, *Law, Psychiatry and the Mental Health System, supra* at 902; *Scott, supra* at 946; Comment, *Advances in Mental Health, supra* at 366. In *Kaimowitz,* the court held that an adult may not give legally adequate consent to experimental psychosurgery, in part because of first amendment protection of the freedom to generate

ideas. Any court must be deeply concerned with potential state control of individual thought and carefully scrutinize instances of forced psychiatric treatment.

■ In the case at bar, the court does not believe that first amendment analysis requires the use of drugs to be enjoined. First, Dr. Greenberg indicated that plaintiff's ability to perform on intelligence tests has not been impaired. Most importantly, plaintiff has indicated a desire to be cured of his mental illness. In his action, he is asserting a right to be treated, and has testified that he *wants* to be cured, not warehoused. Tr. XIV, 170. Thus, the hospital's efforts to alter his thinking disorder cannot be seen as a first amendment violation. The court need not reach the question of whether insane or disordered thought is within the scope of first amendment protection. Comment, *Advances in Mental Health, supra* at 366–67.

■ However, plaintiff also claims that a side effect of prolixin is that it dulls his senses and makes it difficult for him to speak. These side effects are temporary and expected to last only a few days or a couple of weeks, Pepernik, Tr. VII, 23, perhaps two months at the outside, Stinnett, Tr. XI, 132. This effect on mentation differs sharply from the problem faced in *Kaimowitz.* The patient in that case was to be subjected to experimental psychosurgery. The effects would be irreversible and unpredictable, the dangers to the patient substantial, and the benefits uncertain, with no scientifically established therapeutic effect. More specifically as to effects on the mental processes, psychosurgery flattens emotional responses and leads to lack of abstract reasoning ability, loss of capacity for new learning, and impairment of memory. *Kaimowitz, supra* at 909. In sum, if forced medication is otherwise proper, the temporary dulling of the senses accompanying it does not rise to the level of the first amendment violations found in *Kaimowitz.*

C. *The Right to Privacy*

(1) *Individual Interests*

■ The court believes that any right to refuse medication in the absence of an emergency is best founded on the emerging right of privacy. The right of privacy is broad enough to include the right to protect one's mental processes from governmental interference. *Kaimowitz, supra* at 919; *Mackey v. Procunier,* 477 F.2d 877, 878 (9th Cir. 1973); *Stanley v. Georgia,* 397 U.S. 557, 565, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Comment, *Advances in Mental Health, supra* at 367; Comment, *The Right Against Treatment, supra* at 785. Additionally, privacy has been used to establish an individual's autonomy over his own body. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Runnels v. Rosendale,* 499 F.2d 733, 735 (9th Cir. 1974); Comment, *Forced Drug Medication, supra* at 104. In other contexts, courts have established a constitutional right of privacy "broad enough to encompass a patient's decision to decline medical treatment under certain circumstances." *In re Quinlan,* 70 N.J. 10, 40, 355 A.2d 647, 663 (1976). This court holds that the right to refuse treatment extends to mental patients in non-emergent circumstances. *Bell v. Wayne County General Hospital at Eloise,* 384 F.Supp. 1085, 1100 (E.D.Mich.1974) (three-judge court); DuBose, *supra* at 1160; Zander, *supra* at 50. This accords with the usual common law rule against involuntary medical treatment. *Winters v. Miller,* 446 F.2d 65, 68 (2nd Cir. 1971); *Scott v. Plante, supra.* Only where the government shows some strong countervailing interest can the right to refuse be qualified. *See* 1 Report and Recommendation of the President's Commission on Mental Health 44 (1978); DuBose, *supra*; Szasz, *Involuntary Psychiatry,* 45 U. of Cin. L.Rev. 347, 356–57 (1976); Zander, *supra.*

The court feels that the recognition of a right to refuse treatment in a non-emergency situation is practical. The testimony has indicated that involuntary treatment is much less effective than the same treatment voluntarily received. The psychiatric experts stated that it is more likely that a patient will consent to desirable treatment when consulted before action is taken, and when he feels that he has some real control

over his fate, than when he feels totally at the mercy of the hospital doctors.

Furthermore, only the patient can really know the discomfort associated with side effects of particular drugs. Again, the experts agree that they must rely on their patients for evidence of subjective feelings of pain associated with drug usage. Individual autonomy demands that the person subjected to the harsh side effects of psychotropic drugs have control over their administration.

■ It is also difficult for any person, even a doctor, to balance for another the possibility of a cure of his schizophrenia with the risks of permanent disability in the form of tardive dyskinesia. Whether the potential benefits are worth the risks is a uniquely personal decision which, in the absence of a strong state interest, should be free from state coercion.

■ Finally, the testimony in this case underscores the fact that psychiatric diagnosis and therapy is uncertain, with great divergence of opinion in any given case. *O'Connor v. Donaldson,* 422 U.S. 563, 579, 95 S.Ct. 2486, 45 L.Ed.2d 396 (Burger, C. J., concurring). This also weighs toward leaving the final decision with the patient rather than deferring to doctors. Thus, the court concludes that it is appropriate to recognize a right to refuse treatment.

### (2) *State Interest*

■ The constitutional right to refuse treatment cannot be absolute. *Jacobson v. Massachusetts,* 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905). The President's Commission charges all concerned with mental health laws to pay "careful attention to the circumstances and procedures under which the right may be qualified." Commission on Mental Health, *supra* at 44. Based on the evidence in this case, the court has identified three factors to be considered in overriding the patient's right to refuse.

■ First, the state's police power is often cited as one justification for the initial confinement of the mentally ill. The police power permits the state to confine a mentally ill person who presents a danger to himself or other members of society. *O'Connor v. Donaldson,* 422 U.S. 563, 575–77, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); Note, *Wyatt v. Stickney—A Constitutional Right to Treatment for the Mentally Ill,* 34 U.Pitt.L.Rev. 79, 82–83 (1972). The fact that the patient is dangerous in free society may give the state power to confine, but standing alone it does not give the power to treat involuntarily. *Winters v. Miller, supra* at 70. Once confined, the patient cannot hurt those outside.

■ However, the other patients in the hospital also have a constitutional right to protection from harm. Commission on Mental Health, *supra* at 44; *Runnels v. Rosendale, supra* at 735; *Goodman v. Parwatikar,* 570 F.2d 801, 804 (8th Cir. 1978); *Welsch v. Likins,* 373 F.Supp. 487, 503 (D.Minn.1974). If a patient cannot be confined without endangering other patients and staff, and yet he refuses medication that would curb his dangerous tendencies, this would be one factor to weigh in overriding his decision to refuse. Comment, Forced Drug Medication, *supra* at 107.

■ The court found in this case that Mr. Rennie had shown frequent assaultive behavior while at Ancora. At times, this behavior led the Ancora staff to put him in restraints. Mr. Rennie has also complained bitterly about the use of restraints. However, in light of the hospital's duty to safeguard other patients and staff, plaintiff cannot both refuse his medication and be left free to inflict harm on others.

■ A second justification for involuntary confinement and treatment is the doctrine of parens patriae, under which the state cares for those unable to care for themselves. Note, *Wyatt v. Stickney—Constitutional Right to Treatment, supra* at 82–83. It is clear that mental illness is not the equivalent of incompetency, which renders one incapable of giving informed consent to medical treatment. *Scott v. Plante, supra* ; Plotkin, *supra* at 490, 496; Comment, *Advances in Mental Health, supra* at 371; N.J.S.A. 30:4–24.2(c). Therefore, be-

fore the state can use parens patriae as a basis for medication, some hearing on the issue of competency must be held. *Scott v. Plante, supra.*

The factfinder of such a hearing must determine the extent to which the refusal of treatment is based on the underlying mental illnesses. Often, a characteristic of the illness is the inability to recognize and understand the severity of the problem. The greater the lack of insight, the stronger the impetus to override the right to individual autonomy. As stated by Judge Bazelon, "how real is the promise of individual autonomy for a confused person set adrift in a hostile world?" Bazelon, *Institutionalization, Deinstitutionalization and the Adversary Process,* 75 Colum.L.Rev. 897, 907 (1975).

If a factfinder is swayed to allow involuntary medication in part because of the patient's diminished capacity to care for himself, he should also consider the ability of the hospital to provide a reasonable full treatment plan. Since *Rouse v. Cameron,* 125 U.S.App.D.C. 366, 373 F.2d 451 (1966), courts have increasingly been recognizing a right to treatment. If a hospital cannot provide reasonable treatment services beyond the forcing of medication, one would doubt the appropriateness of allowing that institution to act in parens patriae. *Cf. Naughton v. Bevilacqua,* 458 F.Supp. 610 (D.R.I.1978), which held that prolixin could not be used solely to control a patient's behavior, without a habilitative purpose.

In the instant case, the court has found Mr. Rennie's decision-making powers to be somewhat impaired. However, the prior refusal of lithium without an antidepressant was well-founded, and the refusal of prolixin also had a rational basis. As previously noted, prolixin has been discontinued. If the state again seeks to medicate Mr. Rennie without his consent, the court will have to evaluate the basis for using that particular drug when the occasion arises. As part of that inquiry, it will be relevant to determine if Mr. Rennie understands that the alternative to accepting treatment may be permanent custody at Ancora.

As a final consideration, many courts and commentators have employed the concept of least restrictive alternatives in regard to the choice of a custodial setting. *Welsch v. Likins, supra* at 501; *Gary W. v. State of La.,* 437 F.Supp. 1209, 1217 (E.D.La.1976); *Eubanks v. Clarke,* 434 F.Supp. 1022, 1028 (E.D.Pa.1977); *Bazelon, supra* at 901; *Barnett, Treatment Rights of Mentally Ill Nursing Home Residents,* 126 U.Pa.L.Rev. 578, 590 (1978); *Flaschner, Legal Rights of the Mentally Handicapped: A Judge's Viewpoint,* 60 A.B.A.J. 1371 (1974). The court feels that this concept should be extended to the choice of medications. Comment, *Advances in Mental Health, supra* at 376; *Winick, supra* at 813; Commission on Mental Health, *supra* at 44. Under this theory, a patient "may challenge the forced administration of drugs on the basis that alternative treatment methods should be tried before a more intrusive technique like psychotropic medication is used." *Winick, supra.*

In Mr. Rennie's case, psychotherapy had not proved effective. However, plaintiff's experts stated that lithium plus an antidepressant would be a reasonable therapy to which plaintiff would consent. Dr. Heller agreed that lithium and tofrinil was worth a trial. Tr. XIII, 41. Under these circumstances, the hospital is required to give Mr. Rennie a fair trial on the agreed upon lithium and tofrinil regime before seeking to medicate involuntarily the plaintiff. The notion of least restrictive alternatives can also be applied to the threat of tardive dyskinesia. If plaintiff is likely to contract tardive dyskinesia through renewed administration of psychotropic drugs, the cure would be worse than the illness, and involuntary medication would not be permitted.

Although another hearing may be required, the court does not intend to necessitate multiple hearings. The court wishes to avoid a cyclical situation where prohibition of treatment causes a patient's incompetency, upon which his doctors can then overturn his refusal and treat him with drugs, which then help him to regain competency

and his refusal right. Instead, the court will, as much as possible, look to the proper treatment over the long term. Consideration of the least restrictive alternative is part of this long-term analysis.

To summarize, if the trial of lithium and tofrinil has failed and the state seeks to administer another drug which is refused by the plaintiff, the drug can only be administered in an emergency. For a long range program, the state must come back to court for further hearings. On the evidence to date, the court does not believe that tardive dyskinesia is likely at this time; only a preliminary symptom *possibly* indicative of the disease has been shown. The court would find that all less restrictive alternatives have been exhausted if the lithium and tofrinil regime was given a fair trial. The court does find Mr. Rennie dangerous to others on the ward at times. Both his dangerousness and the rationality behind any new refusal would have to be evaluated at a new hearing. Furthermore, perhaps because he is a litigant, Mr. Rennie seems to be receiving an adequate treatment regime.

D. *Due Process*

In light of the extended nature of these hearings, Mr. Rennie certainly has received all the process to which he is due. However, in view of this court's practical experiences during this hearing, it is perhaps appropriate to comment on what the court feels are the shortcomings of the state's new Bulletin 78-3 regarding psychotropic medication, which appears as an appendix to this opinion.

■ First, the court finds that there is a sufficient liberty interest so that due process attaches. To go from a state of confinement to confinement plus forced medication involves a major change in the conditions of confinement, so that *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1975) is inapposite. A drug regimen subjects a patient to harsh side effects and possible permanent disability, effects different in kind than the differences between places of confinement. Furthermore, a

hearing is required to insure that the use of drugs in a particular case does not violate the first or eighth amendments or the right of privacy. Thus, in the absence of emergency, some due process hearing is required prior to the forced administration of drugs. *Scott v. Plante, supra. See also Clonce v. Richardson,* 379 F.Supp. 338, 349 (W.D.Mo. 1974); Plotkin, *supra* at 491; Winick, *supra* at 816; *Winters v. Miller, supra* at 71. *Cf.* Bazelon, *supra* at 909.

A due process hearing is also required because there is great risk of hospital error. As we have seen, hospital records are difficult even for the staff to use. Entries are sometimes missed, and the complete drug history is not always clear. This underscores the need for systematic review of the decision to medicate involuntarily.

■ Initially, patients must be informed of and participate in the decision-making aspects of their treatment. *In re W. S., Jr.,* 152 N.J.Super. 298, 377 A.2d 969 (Juv. and Dom.Rel.Ct.1977).

■ Patients are entitled to a lawyer to assist them. Counsel is necessary to cope with the problems of law, to make skilled inquiry into the facts, and to insure proper procedures. *Bell, supra* at 1092 (quoting *In re Gault,* 387 U.S. 1, 36, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)); *cf.* Bazelon, *supra* at 910. It is clear in this case that without the tireless efforts of Mr. Gelman and his staff at the Public Advocate's Office, Mr. Rennie could not effectively have made an argument before a factfinder and brought his case before this court. *See, Scott, supra* at 950.

■ Independent psychiatrists are also essential to a fair hearing. Unless the state elects to set up some form of independent administrative board to review treatment decisions, the patient is entitled to an outside psychiatrist of his choice to evaluate the need for medication. *See* Senator Menza's Bill, Senate No. 1032 (October 23, 1975), vetoed March 4, 1976.

A hospital-retained psychiatrist is not sufficient. As Dr. Pepper testified, psychi-

atrists are as objective as lawyers when representing a client. When Dr. Pepernik and Dr. Stinnett reviewed plaintiff's files, they began with the assumption that the choice of prolixin was correct. Dr. Heller was also influenced by having the hospital doctors refer him to specific sections of the charts. Patients refusing treatment must be entitled to an outside consultant of their choice so that all of the facts can be aired.

The court also notes that once the outside consultants and hospital psychiatrists began talking, it was possible to reach areas of agreement and a fuller understanding of Mr. Rennie's problem. Thus, it believes that the presence of independent doctors will aid rather than inhibit treatment.

 Finally, the patient's lawyer and psychiatrist must have access to hospital records to determine comprehensively the position of their client. Where the patient cannot reasonably afford an attorney or a psychiatrist, the state must supply them.

### V. *Conclusion*

As the involuntary medication of prolixin was terminated, no injunction need issue on that point. Due to the time required for briefing and preparation of this opinion, over four months have passed since the parties were last in court. Accordingly, the court is not fully aware of the present status of Mr. Rennie and what effect an injunction would have.[6] Therefore, no injunction will issue at the moment. If Mr. Rennie now refuses any drug which the Ancora doctors seek to administer in a non-emergency situation, the court will upon notice restrain the administration of the drug and immediately schedule hearings to examine (1) plaintiff's physical threat to patients and staff at the institution, (2) plaintiff's capacity to decide on his particular treatment, (3) whether any less restrictive treatments exist, and (4) the risk of permanent side effects from the proposed treatment.

### APPENDIX

DIVISION OF MENTAL HEALTH AND HOSPITALS
ADMINISTRATIVE BULLETIN 78–3

March 1, 1978

SUBJECT: The Administration of Psychotropic Medication to Voluntary and Involuntary Patients

I. Introduction

 A. Issue

 Division guidelines governing the administration of psychotropic medication to voluntary and involuntary psychiatric hospital patients.

 B. Objectives

 1. To fulfill our ethical, professional and statutory responsibilities in improving the condition of psychiatric hospital patients;

 2. To provide patients with the opportunity to participate in the development of their own individual treatment plans;

 3. To provide for medical review of the treating physician's medication determination;

 4. To utilize the patient's treatment team in formulating clinical care.

---

**6.** It is the court's understanding that as of the date of this opinion Mr. Rennie is not receiving psychotropic drugs, and may soon be released from Ancora.

C. Legislative Parameters

1. Every individual who is mentally ill is entitled to medical care and other professional services in accordance with accepted standards. N.J.S.A. 30:4–24.1. New Jersey courts have also recognized that a psychiatric hospital patient has an affirmative right to receive treatment and that a hospital has a correlative responsibility to attempt to improve the condition of its patients.

2. Each patient has the right to participate in planning for his own treatment to the extent that his condition permits. N.J.S.A. 30:4–24.1.

3. (a) Voluntary patients have the right to refuse medication. N.J.S.A. 30:4–24.2. d (1).

 (b) The chief executive officer of a state or county psychiatric hospital is authorized to give consent for psychiatric treatment to patients declared legally incompetent by a court or patients under the age of 21 under certain conditions. See N.J.S.A. 30:4–7.1 – 7.6.

 (c) Patients have the right to be free from unnecessary or excessive medication. N.J.S.A. 30:4–24.1 d (1) [30:4–24.2 d (1)].

 (d) Medication may not be used as punishment, for the convenience of staff, or as a substitute for a treatment program. N.J.S.A. 30:4–24.1 d (1) [30:4–24.2 d (1)].

 (e) Notation of each patient's medication shall be kept in his treatment records. At least weekly, the attending physician shall review the drug regimen of each patient under his care. All physicians' prescriptions shall be written with a termination date, which shall not exceed 30 days. N.J.S.A. 30:4–24.2 d (1).

D. Judicial Parameters

Although existing case law is not clear with respect to the administration of medication to involuntary patients, in December 1977 a New Jersey County District Court Judge held, in the case of, in Re Mark B., that under certain conditions, "Involuntarily committed patients do not have the right to refuse medication."

II. The Involuntary Administration of Medication

Definitions

1. A patient is considered incompetent only if he has been adjudicated incompetent by a court.

2. Medication is considered a necessary part of a patient's treatment plan when either:

 (a) The patient is incapable, without medication, of participating in any treatment plan available at the hospital that will give him a realistic opportunity of improving his condition; or

 (b) Although it is possible to devise a treatment plan that is available at the hospital and will give the patient a realistic opportunity of improving his condition; either:

 (1) a treatment plan which includes medication would probably improve the patient's condition within a significantly shorter time period; or

 (2) there is a significant possibility that the patient will harm himself or others before improvement of his condition is realized, if medication is not administered.

A. Emergency Administration of Medication

The procedures described in this Bulletin are not intended to preclude the administration of psychotropic medication to a patient in an emergency.

Therefore, if a physician certifies that it is essential to administer psychotropic medication in order to prevent the death of or serious consequences to a patient, the Chief Executive Officer is authorized to consent to the administration of the medication recommended by the physician's certification. If it is impossible to comply with this procedure without jeopardizing the life of the patient, the medication may be administered on a physician's order.

B. If a patient refuses to take the psychotropic medication that has been prescribed for him, the attending physician shall speak to the patient and attempt to explain: his assessment of the patient's condition; his reasons for prescribing the medication; the benefits and risks of taking the medication; and the advantages and disadvantages of alternative courses of action.

If the patient still refuses to take the medication and the physician still believes that medication is a necessary part of the patient's treatment plan:

(a) The physician should tell the patient that the matter will be discussed at a meeting of the patient's treatment team;

(b) If the patient's clinical condition permits, the physician should invite the patient, to attend the meeting of the treatment team.

(c) The physician should suggest that the patient discuss the matter with a person of his own choosing, such as a relative or friend.

C. The treatment team shall meet to discuss the physician's recommendation and the patient's response.

(1) If the patient is present, the team shall attempt to formulate a treatment plan that is acceptable to the patient and the team. The patient may agree to take medication unconditionally or under certain conditions that are acceptable to the physician.

(2) If the patient is not present, the team and the physician shall discuss the physician's recommendation and the patient's response, and shall document their respective conclusions.

D. If, after the team meeting, the physician still believes that medication is a necessary part of the patient's treatment plan and the patient still refuses to take the prescribed medication,

Then:

Case 1: Patients Adjudicated Incompetent by a Court

(1) If there is a consensus in regard to the necessity of the medication, the physician shall attempt to secure the consent of the patient's guardian.

If the patient's guardian, after reasonable notice of the proposed action and a request for consent, refuses or neglects to execute and submit a writing expressing either the grant or denial of consent,

Then, The Chief Executive Officer may consent to the administration of medication.

(2) If there is disagreement between the team and the physician in regard to medication, then the medical director (or his designee) shall conduct a personal examination of the patient and a review of the record. If the medical director (or his designee) agrees with the physician, the physician shall attempt to secure the consent of the guardian.

If the patient's guardian, after reasonable notice of the proposed action and a request for consent, refuses or neglects to execute and submit a writing expressing either the grant or denial of consent,

Then, The Chief Executive Officer may consent to the administration of the medication.

Case 2: Patients Who Have Not Been Adjudicated Incompetent by a Court

Part I—Voluntary Patients

Medication may not be administered to a voluntary patient who refuses to accept it.

Part II—Involuntary Patients

The medical director (or his designee) must conduct a personal examination of the patient and a review of the record. If the medical director (or his designee) agrees with the necessity for medication, the medication may be administered as a part of the patient's documented individualized treatment plan.

E. Miscellaneous

 1. Independent Evaluations

Whenever the medical director (or his designee) is asked to review a medication decision, the medical director shall be authorized to retain an independent psychiatric consultant to evaluate the patient's need for medication. This would be indicated particularly in cases where there is disagreement between the treating physician and the team.

If the patient is evaluated by an independent psychiatric consultant invited by the hospital and the consultant recommends a treatment plan that does not include the administration of medication, then the medical director in the report filed in the treatment record, shall address the conclusions and recommendations of the consultant.

 2. Review

In addition to the reviews mandated by N.J.S.A. 30:24.2 d (1), the medical director (or his designee) shall review each week the treatment program of each involuntary patient, who is refusing to accept medication voluntarily, to determine:

(a) Whether the patient is still refusing his prescribed medication;

(b) Whether medication is still a necessary part of the patient's treatment plan; and

(c) Whether the other components of the patient's treatment plan are being implemented.

 3. Documentation

Each step of the procedures outlined above shall be documented in the patient's chart.

s/ Michail Rotov
Michail Rotov, M.D., Director
Division of Mental Health and Hospitals

---

ON RENEWED MOTION FOR
PRELIMINARY INJUNCTION

This is a renewed motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65 by plaintiff John E. Rennie, an involuntary patient of Ancora Psychiatric Hospital. He seeks to enjoin the defendant psychiatrists and officials at Ancora from forcibly administering drugs to him in the absence of an emergency situation. The complaint is grounded on 42 U.S.C. § 1983, with jurisdiction pursuant to 28 U.S.C § 1343.

This court held fourteen days of hearings on the original motion between January 13 and April 28, 1978, and issued its opinion November 9, 1978. 462 F.Supp. 1131. Although the opinion discussed the facts of the case and legal issues at length, the court did not issue an injunction since the record did not reflect the plaintiff's then current status. Furthermore, the court had been informally advised by counsel that plaintiff's condition had improved substantially, and release from the hospital was contemplated. The opinion left the courthouse door open for plaintiff to reapply for immediate injunctive relief if his condition worsened and the hospital again attempted to medicate plaintiff against his will in a non-emergent situation.

Unfortunately, the plaintiff's condition has greatly deteriorated in recent weeks, and as a result the hospital on December 2, 1978 began to administer the antipsychotic

drug thorazine without plaintiff's consent. Plaintiff renewed his motion for an injunction on December 6, and a hearing was held the following day. After hearing the testimony of plaintiff's witnesses and the arguments of counsel, the court denied the motion. The following are the court's findings of fact and conclusions of law, Fed.R.Civ.P. 52, which supplement the findings and conclusions set forth in the November 9 opinion.

## FINDINGS OF FACT

### I. *Plaintiff's Condition*

Mr. Rennie's mental health began to deteriorate within a few days after the November 9 issuance of the earlier opinion. He became increasingly manic, exhibiting grandiose behaviors. Transcript of December 7 hearing, pages 43–60, hereinafter cited as Tr. 43–60. By November 14, he was transferred to a closed ward and placed on homicidal precautions. His behavior has become increasingly abusive and assaultive, and he has suffered from inability to sleep and hallucinations. Tr. 31–37. He has been in restraints much of the time since November 14, and is currently in a state described by his treating psychiatrist, Dr. Engrazio Balita, as floridly psychotic. Tr. 28. His physical condition has also deteriorated, and he has suffered dehydration, abnormal fluctuations in temperature, and probable infection. Tr. 28–31. Dr. Balita testified that these complications have imperilled his life. Tr. 28.

Mr. Rennie has been on a maintenance dosage of lithium carbonate. However, while on a furlough from Ancora the first week of November, he stopped taking this medication, Tr. 45, and refused it upon returning to the hospital.[1] Tr. 48. However, after appeals from his counsel, Mr. Gelman, he began taking lithium November 14 and attained a maintenance level of the drug in his blood on November 24. Tr. 50–58.

As the lithium failed to stabilize plaintiff's condition, Dr. Balita began emergency injections of thorazine on December 2, and at a treatment team meeting December 5 recommended that thorazine be forcefully administered in accordance with Administrative Bulletin 78–3. This recommendation was approved at the meeting, and reviewed and approved the following day by Dr. Max Pepernik, the Ancora Medical Director. Tr. 9, 27.

### II. *The Four Factors*

In the November 9 opinion, the court stated four factors which must be considered in determining if an injunction should issue. These are (1) plaintiff's physical threat to patients and staff at the institution, (2) plaintiff's capacity to decide on his particular treatment, (3) whether any less restrictive treatments exist, and (4) the risk of permanent side effects from the proposed treatment. These factors will now be applied to the current situation.

Plaintiff has repeatedly threatened patients and staff during the past few weeks, and has been put on homicidal precautions by the hospital. Tr. 49, 53. It has often been necessary to place him in restraints to protect the plaintiff himself as well as others in the institution. Tr. 68.

The court accepts Mr. Gelman's representation that in his current psychotic thrall Mr. Rennie has still knowingly refused to consent to injection of thorazine. Tr. 4. But as the court indicated in its November 9 opinion, his capacity to participate in the choice of medication is limited. Plaintiff's failure to take lithium the last several weeks is additional evidence of his limited capacity to make treatment decisions, as the expert testimony is almost unanimous that lithium is a helpful drug with only minor side effects to Mr. Rennie. It should be noted that he has not only refused lithium while in his current manic state, but also early in November when his condition had markedly improved.

---

1. Dr. Balita testified that plaintiff's persistence in refusing lithium was buoyed by the court's November 9 opinion (though that opinion approved use of that drug). Tr. 30. The doctor also stated that Mr. Rennie's discussion of the opinion in a hospital ward for the criminally insane encouraged other patients in that ward to refuse medication. Tr. 49.

Analyzing plaintiff's behavior, the court concludes that while his refusal of thorazine is partly motivated by a rational desire to avoid harmful and unpleasant side effects, it is also prompted by an irrational desire to rebel against the hospital and its doctors. Therefore the court finds that plaintiff's capacity is severely limited, particularly at the present time, but also over the course of his illness. However, if plaintiff continues his present cooperation with the doctors in taking lithium for a few months, the court might reconsider this finding of lack of capacity. On the other hand, Mr. Rennie need not consent to psychotropic medication to demonstrate capacity, as his refusal of these drugs at this time has, at the least, a rational basis. The court may reconsider this finding at a later time, however.

As was stated in the court's earlier opinion, the lithium regime must be given a fair trial as a less restrictive treatment. Plaintiff's expert, Dr. William T. Carpenter, testified that lithium has not yet had a complete chance, Tr. 211, but this is partly because plaintiff has failed to take the medication. Tr. 46.

Even plaintiff's expert indicated that a psychotropic was essential to stabilize Mr. Rennie. He recommended that thorazine be administered for at least one week or until Mr. Rennie's condition had stabilized to the point where he could be released from restraints and lithium and psychotherapy could be effectively employed. Tr. 114.

The court therefore finds there is currently no less restrictive alternative to thorazine, other than constant restraints, which will safeguard plaintiff and others in the hospital, and no alternative treatment which offers a reasonable chance of alleviating plaintiff's current acute psychosis. The court further finds that this situation will continue until the plaintiff's condition has stabilized and improved, and until plaintiff demonstrates a convincing willingness to participate in a lithium and psychotherapy regime.

Finally, the court must consider the risk of permanent side effects. The court is concerned about tardive dyskinesia which, as stated in the earlier opinion, is a cure worse than the mental disorder itself. While Dr. Carpenter testified that he had observed mild abnormal movements of the jaw and extremities at an August 24 examination of Mr. Rennie, Tr. 91–92, plaintiff's counsel conceded that plaintiff has no symptomatic movements at this time. Tr. 79. Dr. Carpenter concluded that Mr. Rennie may have had a very mild, reversible case of tardive dyskinesia, and at least has a predisposition to the disease. Tr. 92–93. However, he also indicated that short-term use of thorazine does not pose a significant threat, though he cautioned against use of thorazine for more than four weeks, particularly if the drug does not greatly affect Mr. Rennie's psychosis. He also stated Mr. Rennie should be watched closely for manifestations of tardive dyskinesia symptoms. Tr. 115–25.

The court agrees that close scrutiny is vitally necessary, but does not believe that the threat of the disease is salient enough to preclude use of thorazine at this time.

## CONCLUSIONS OF LAW

As plaintiff's capacity is severely limited, and as thorazine injections provide the least restrictive means to stabilize plaintiff's condition in order that lithium and psychotherapy may be used (with or without thorazine), and in order that the hospital may safely remove plaintiff from restraints, no injunction will be issued.[2]

The court has indicated its desire to avoid multiple hearings by examining the situation over the long term at this injunction hearing. However, the need to administer thorazine for a week or two became readily

2. The Attorney General has indicated that he may wish to appeal this decision despite the favorable outcome because of the court's statements on the law. The court will consider an application for certification to appeal under 28 U.S.C. § 1292(b) when such a petition is made. Subsection (b) certification may be used for the purpose of avoiding serious harm to a litigant *pendente lite* from an erroneous interlocutory order. *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3rd Cir.), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974).

apparent, and the court did not require defendants to call their witnesses and provide their long-term treatment plan.[3] Neither did the treatment team evaluation of December 5 indicate how long thorazine will be used. Furthermore, as plaintiff's counsel, Mr. Gelman, conceded at the hearing, it was not the best time in plaintiff's view to decide his long-term care. Tr. 72.

But consistent use of lithium for several weeks is required to demonstrate plaintiff's renewed capacity to choose his treatment, as well as to enable the hospital and this court to confidently assume that lithium and psychotherapy alone may be given a realistic trial through proper use. Therefore, this decision should be conclusive for at least two months, barring any significant evidence of tardive dyskinesia or drastic change in any other relevant factor in the court's decision. The court is still very concerned about the possibility of tardive dyskinesia and urges the hospital to monitor Mr. Rennie closely for signs of this disease. Furthermore, the court stresses that the hospital should carefully consider the need for continued administration of thorazine in light of objective medical evidence and plaintiff's refusal of the drug. The court hopes that reasoned action by both parties will preclude the need for further applications for preliminary injunctive relief.

Both parties have also asked the court to clarify the procedures for seeking an injunction established in the November 9 opinion and the definition of the term emergency used in the opinion. These procedures will apply to any later appeal by plaintiff for injunctive relief on this issue. Emergency signifies a sudden, significant change in the plaintiff's condition which creates danger to the patient himself or to others in the hospital. While restraints can always eliminate this danger, Tr. 68, this is a realistic alternative only if a few hours' confinement are adequate to calm the plaintiff. Otherwise the hospital is not required to place the plaintiff in permanent restraints rather than forcefully medicate.

The emergency is deemed to last until the administrative procedures under Bulletin 78–3 may be followed, but no longer than 72 hours regardless. At that time, plaintiff may, if he wishes, seek a temporary restraining order by notifying the court and the state, and presenting evidence that psychotropics are being forcefully administered. Then the court will issue the restraining order and immediately schedule a preliminary injunction hearing, to be held within 72 hours if possible, to consider the right to refuse treatment under the four stated factors.

### ORDER

Application by plaintiff on his renewed motion for preliminary injunction being heard by the court on the 7th day of December, 1978; and

The court having considered the testimony of Dr. William T. Carpenter (plaintiff's medical expert psychiatrist) and Dr. Engrazio Balita (employee of defendant and plaintiff's treating psychiatrist at Ancora), exhibits, briefs and argument of counsel; and

For the reasons stated in the court's opinion of December 12, 1978,

It is on this 12th day of December, 1978, ORDERED that the renewed motion for a preliminary injunction is denied.

---

**3.** A plan will be required by the pre-trial order in this case, so that long-term use of psychotropics may be fully considered when the consent to treatment issue is tried.